The People of the State of New York ex. rel. Watchtower Bible and Tract Society, Inc., Relator, against Frank Mastin et al., Constituting the Board of Assessors of Taxes of the Town of Lansing, Respondents.

Supreme Court, Special Term, Tompkins County, April 19, 1948.

*Hayden C. Covington* for relator.

*Charles H. Newman* for respondents.

Coon, J. Relator claims to be exempt from taxation on certain agricultural lands which it owns in the town of Lansing, Tompkins County, New York, pursuant to subdivision 6 of section 4 of the Tax Law. The amount of the assessment and the regularity of the assessment proceedings are not at issue, and the sole question is one of complete exemption.

The relator is a New York corporation with headquarters in the borough of Brooklyn, City of New York, organized under the Membership Corporations Law. Its charter provides that it is organized for some of the purposes, mentioned in the above section of the Tax Law which exempts its real property from taxation if used exclusively for such corporate purposes. The relator is the legal and governing body of a group who call themselves " Jehovah's witnesses ". It maintains and operates a large publishing plant in Brooklyn, where it publishes bibles, pamphlets, magazines and other literature dealing with religious subjects, for distribution by Jehovah's witnesses. It makes a charge for all literature delivered by it to the distributors and they in turn ordinarily receive a larger cash receipt for it when they dispose of it either on the streets or from house to house. Relator also owns and maintains a large seven-story brick hotel-type building in Brooklyn, which it calls " Bethel Home ". In this building it provides complete living accommodations and meals for a group ranging from 250 persons upward, whom it

calls " the Bethel family ". The Bethel family consists largely of those engaged in operating the printing plant and the administrative and office personnel. Relator also owns, in addition to the property involved here, other farms and a radio station.

The property involved here consists of six separate parcels of agricultural land, originally six separate farms, operated by the relator as one large farm which it calls " Kingdom Farm ". Kingdom Farm is well equipped and stocked with a large dairy, beef cattle, hogs and poultry. There are 701 acres of land with numerous buildings. Six hundred and fifty acres are tillable. Aside from large quantities of grain and fodder for livestock, fruits and vegetables are grown. Kingdom Farm is not different from any large farming operation in any sense, except that upon one of the parcels is located a brick building which relator calls " Bible School of Gilead ", and which is used by students for bible study and instruction in the beliefs of Jehovah's Witnesses. This building has been exempted from taxation by the respondents. Kingdom Farm had been operated to produce agricultural products for a substantial length of time before this school was built.

While the respondents challenge the good faith of the organization of the relator for the exclusive purposes set forth in its charter, the court concludes that this case must be determined upon the nature of the use of the property in question. It is true that the beliefs of Jehovah's Witnesses are unorthodox and at great variance with the more commonly accepted forms of religion. Much of their literature consists of bitter attacks upon and denunciations of the more conventional religious practices and the churches of various faiths. Many of their views with respect to religion and to civic matters would be found repulsive to other persons. It is nevertheless clear that they have a right to entertain such views as they wish and to promulgate them to others. The legal status of the relator's corporation purposes is not altered by the fact that it disseminates them from house to house in printed form instead of in churches, nor by the fact that it receives a financial return from its publications. (*Murdoch* v. *Pennsylvania,* 319 U. S. 105.)

The contention of the respondents, in substance, that even a corporation engaged in religious work should not be entitled to the benefit of tax exemption statutes when its financial receipts for the year ending August 31, 1947, amount to $3,052,638.52, and its assets have steadily increased to a most substantial figure, might be a cogent argument addressed to the Legislature but under the statute in question has no bearing upon a judicial

construction. The evidence presented in this case fails to disclose that any officer, member or employee of the relator received or became entitled to receive any pecuniary profit from its operations contrary to the provisions of the Tax Law.

The sole remaining question is whether or not the real estate known as Kingdom Farm is used by the relator exclusively for its corporate purposes. It is without dispute that this property was used during the taxable year exclusively for the production of crops, livestock and farm products generally. It is not claimed that the premises were used directly for any religious, scientific, experimental, educational or training purposes. It then becomes a question of what use was made of the products of the farm. It is without dispute that all of the products of any nature produced thereon were used for one of three purposes, i.e., (1) as food for the students attending Bible School of Gilead; (2) as food for the Bethel family in Brooklyn; (3) sold to the public generally for money. The portion used in the first category is without question used for corporate purposes, but the quantity is so comparatively small and insignificant that it is not even claimed that the premises were operated for such purpose or that the operation of the premises would be justified for such a purpose. The relator has assumed that the production of food used in the second category to feed the Bethel family is unquestionably for a purpose that would entitle the property to exemption; and that the products used in the third category for sale to the public were merely incidental sales of surplus not affecting the exempt status. The court cannot agree with either of these assumptions.

Relator's first assumption is based upon its frequent assertion that the members of the Bethel family are ministers and that the food is furnished to them gratuitously. They are not ministers in any legal sense or within the commonly accepted meaning of that term. Their qualifications do not include any recognized educational requirements or graduation from any recognized educational institution. They have attained no peculiar qualifications for the ministry. Their ordinary and regular duties are not the ordinary and regular duties of a minister as such are ordinarily accepted and understood. The vast majority of them perform the manual labor of operating machinery and equipment in the publishing house not at all dissimilar to the services of any employee of a commercial publishing house. Others regularly perform secretarial, bookkeeping and administrative duties not at all dissimilar to the duties of any office worker. If they perform any work at any time which is directly of a religious nature (the evidence is vague as to whether they do or not), it is

in their spare time and is trivial and incidental. Such work, if any, alone would no more entitle them to the designation of " minister " than would the work of a Sunday school teacher in one of the more conventional churches. They are not ordained within any commonly accepted meaning of that word. It is true that they are given an " ordination certificate " issued by the relator. The evidence as to the qualifications for such a certificate is so vague that it appears to the satisfaction of this court that the certificate is issued merely at the pleasure of the relator corporation to anyone connected with its organization. The farm manager and all of the farm employees who do the work upon Kingdom Farm are designated as " ministers ". However, the record is so full of their worldly duties of managing and working the farm and so barren of any time whatever spent in spreading the gospel, or in any spiritual pursuit, that the court cannot accept the designation. (*Buttecali* v. *United States*, 130 F. 2d 172; *Cox* v. *United States*, 332 U. S. 442.)

Neither is the food furnished gratuitously to the Bethel family. It is compensation for their manual services in the publishing plant and offices of the relator. The mere fact that the relator's activities relate to religion does not necessitate blind acceptance of its characterization of these persons as volunteer workers engaged in spreading the gospel for a " nominal " allowance. The only honest, realistic factual conclusion which seems reasonable from the evidence is that they are employees manning machines in a printing shop and are paid partially in goods instead of money. Their compensation, consisting of complete and comfortable housing, heat, light and public services, meals consisting of unlimited rations of the best foods, laundry, traveling expenses when " upon the business of the Society ", in some instances medical attention and clothing allowances, plus $10 per month in cash, would compare most favorably under present price conditions with the wages of any employee in a commercial publishing house. It would not even be arguable that the relator could operate a tax exempt farm in a distant community and use the cash proceeds from the sale of its products to pay its publishing house employees. It seems clear that it was not within the contemplation of the Legislature that it can gain exemption by the simple process of paying its employees with the products themselves instead of cash. For all legal purposes these employees seem to be comparable with the lay employees of conventional churches. It seems no different in principal than the maintenance of a farm by a group of churches for the purpose of producing food for their janitors, maintenance men and other paid lay employees, as a part of their compensation.

If the court be mistaken in the foregoing interpretation, the relator's claim for exemption still must fail. The third use of the products of Kingdom Farm, the sale to the public, is clearly not a corporate purpose. A brief consideration of the volume of such sales, the manner of making the sales, the efforts devoted to producing the most salable products, and the continued production, year after year, in large volume of products *known in advance* to be usable only for sale demonstrates that such sales cannot fairly be said to be the incidental disposition of surplus, but constitutes one of the primary purposes of the operation of the farm.

It appears without dispute that during the taxable year here involved, ending August 31, 1947, the relator sold from Kingdom Farm dairy products, poultry and eggs, hides, dairy cattle, and fruits and vegetables of various kinds. Its employees made regular and systematic trips to Ithaca, New York, and the surrounding vicinity, to sell various kinds of vegtables and farm products to restaurants and other commercial users. A truck was sent weekly during the growing season from the farm to the regional market at Syracuse, New York, with a load of products from the farm. This is a public market for the use of farmers (incidentally, created and partially maintained from taxes), and the products of Kingdom Farm were systematically offered for sale each week in open and immediate competition with taxpaying farmers. Dairy cattle were bought and sold in competition with taxpaying farmers at the " Earlville Sales ", a widely known and used public auction system for transactions in dairy cattle. It produced and offered for sale to the public a variety of kinds of cheese which could be purchased at the farm or be shipped to any purchaser.

According to relator's own figures, the value of the total production of Kingdom Farm for the year ending August 31, 1947, was $126,046.86, and the value of the production on Carmel Farm (a nearby farm owned by relator but not directly involved here) was $43,741.43, and the amount sold from both farms was $59,883.82. This is a substantial percentage and its designation as an insignificant surplus cannot be justified.

The sales of poultry and eggs for the year ending August 31, 1947, from Kingdom Farm alone amounted to $22,067.11, and produced a net gain of $14,199.13. It is a fair inference that the reason such enormous quantities of poultry and eggs were produced each year was because such products were readily salable and produced a handsome profit. Similar products sold for the year ending 1946 amounted to approximately the same figure, and for many years large amounts of poultry products

were sold. This would seem to eliminate the incidental feature of the surplus and render it an intentional surplus for the purpose of sale. The relator states in its brief that the large poultry department was established " years ago in anticipation of providing poultry for the institution at Brooklyn head-quarters. However, due to the operation of the poultry depart-ment on Staten Island, New York City, it never became neces-sary to make demand upon the Kingdom Farm poultry depart-ment for supplies of eggs to maintain the institution." Yet during these " many years " relator has continued the heavy production of poultry and eggs, knowing well in advance that it had no use for them except for sale. Why were they pro-duced? The obvious answer is to sell and to make money. In fact, the relator anticipates in the reply brief that the court would necessarily have to find that the operations of the poultry department eliminate any claim of exemption and suggests an arbitrary figure of one thirtieth of the premises (apparently acreage actually occupied by poultry houses and yards) be separately assessed as taxable. Of course, this belated sug-gestion is not feasible as the entire premises, including the poultry department, are operated as one operation, using the same equipment, facilities and land for the production not only of the poultry but of poultry feed, straw and other materials used in the maintenance of the poultry department.

The line of cases cited involving educational institutions, where farms were operated for experimental, scientific and demonstration purposes and some products were sold, need not be distinguished individually. The property in question here was used for no such purpose. It is unnecessary to dis-tinguish individually the line of cases holding that occasional sporadic, irregular and insignificant sales do not destroy the exemption. The factual situation here is not comparable.

It is well established that the exemption statutes should be strictly construed and that the burden is upon the property owner to establish the right to exemption by clear and con-vincing proof, and that the right to exemption is lost if the property is used partially for exempt purposes and partly for purposes not exempt. (*People ex rel. Mizpah Lodge* v. *Burke,* 228 N. Y. 245; *Young Women's Christian Assn.* v. *City of New York,* 217 App. Div. 406; *People ex rel. Young Men's Assn.* v. *Sayles,* 32 App. Div. 197, affd. 157 N. Y. 677.) It follows that the property was not exclusively used for an exempt purpose and that the assessors properly assessed it as taxable.

The motion of the respondents for judgment should be granted and the petition dismissed, with costs to be taxed.