Samuel A. Spiegel, J.
Petitioner seeks judgment commanding that its property be removed from the city’s tax roll.
The property had been tax-exempt, but was restored to the tax roll pursuant to Local Law No. 46 of 1971 of the City of New York. It was adopted following an amendment in 1971 (L. 1971, ch. 414) by the New York State Legislature of section 420 of the Real Property Tax Law, now numbered section 421, effective January 1,1972. Section 421 (as amd. retroactively by L. 1972, ch. 529) reads in part:
“ Non-profit organizations.
“ 1. (a) Real property owned by a corporation or association organized or conducted exclusively for religious, charitable, hospital, educational, moral or mental improvement of men, women or children or cemetery purposes, or for two or more such purposes, and used exclusively for carrying out thereupon one or more of such purposes either by the owning corporation or association or by another such corporation or association as hereinafter provided shall be exempt from taxation as provided in this section.
“ (b) Real property owned by a corporation or association which is not organized or conducted exclusively for .religious, charitable, hospital, educational, moral or mental improvement of men, women or children or cemetery purposes, or for two or more such purposes, but which is organized or conducted exclusively for bible, tract, benevolent, missionary, infirmary, public playground, scientific, literary, bar association, medical society, *563 library, patriotic or historical purposes, for the enforcement of laws relating to children or animals, or for two or more such purposes, and used exclusively for carrying out thereupon one or more of such purposes either by the owning corporation or association, or by another such corporation or association as hereinafter provided, shall be exempt from taxation; provided, however, that such property shall be taxable by any municipal corporation within which it is located if the governing board of such municipal corporation, after public hearing, adopts a local law, ordinance or resolution so providing.”
New York City Local Law No. 46 of 1971 provides: “ Beal property owned by a corporation or association which is not organized or conducted exclusively for religious, charitable, hospital, educational or cemetery purposes, or for two or more such purposes, but which, is organized or conducted exclusively for the moral or mental improvement of men and women or for bible, tract, benevolent, missionary * * * purposes * * * or for, two or more such purposes, and used exclusively for carrying out thereupon one or more of such purposes * * * shall be taxable.”
Respondents urge it was the legislative intent to distinguish between property used exclusively for religious, charitable, or other specified purposes, and actually used for such purposes, as set forth in section 421 (subd. 1, par. [a]) of the Beal Property Tax Law, and real property which is owned by a corporation or association organized or conducted for Bible, tract, benevolent, missionary or other specified purposes, and actually used for such purposes, as set forth in section 421 (subd. 1, par. [b]) of the Beal Property Tax Law. They argue that in the past several years, petitioner’s main activity has been the publication of two magazines, the weekly America and the monthly Catholic Mind. Examination of those publications, it is said, discloses that they are not limited to religious subjects. Bather, they consist primarily of articles on nonreligious topics reflecting petitioner’s viewpoints on political and economic issues. It is clear from the foregoing that the court is invited to join the argument of semantics as it pertains to what is, or is not, religious activity or exclusively religious activity. More particularly, it seems, the court is asked to sit in judgment as to the breadth of proper religious and canonical activity vouchsafed to the man of the cloth and when, if at all, he oversteps the bounds of religious call.
In discussing exclusivity, respondents cite Matter of Board of Foreign Missions of M. E. Church v. Board of Assessors of *564 City of N. Y. (244 N. Y. 42, 45, 46). The court there stated: “ If the relator had confined itself to this use, it would have been exempt from taxation * * * It went further, and permitted in rather a minor degree, to be sure, the use of a portion of its property by outsiders for hire.”
Public use was the ground, also, for sustaining loss of tax exemption in Young Women’s Christian Assn. v. City of New York (217 App. Div. 406, affd. 245 N. Y. 562). Such diversion is claimed here in that petitioner’s magazines are not limited to religious subjects. Bather, they contain a large number of articles in support of selected political and economic views and in opposition to other political and economic views. In addition, it is urged, they compete in the media field with other publications seeking to espouse and to promote various ideas and points of view and to attract general readers and subscribers. Advertisers are solicited. Expenditures are used for the maintenance of the property in which petitioner is located and from which the business is conducted. Thus, it is argued that there is not the required exclusivity of purpose or use. (People ex rel. Chamber of Commerce of State of N. Y. v. Mills, 188 Misc. 593, affd. 272 App. Div. 804, mot. for. lv. to app. den. 297 N. Y. 1039.)
As another example of lack of exclusivity respondents cite People ex rel. Watchtower Bible & Tract Soc. v. Mastin (191 Misc. 899). There, a religious corporation owned a farm and sold a substantial portion of the produce to the public and therefore the property was used partially for nonexempt purpose. The inference is that the growing of produce is a religious purpose and earns tax exemption if there is no diversion. The question is, therefore, whether publication like farm produce is a religious purpose and whether by reason -of subject matter there is a diversion to be equated with renting space to the public or sale of produce to the public.
Whether an exclusively religious purpose is here involved is a question not altered in the nature or extent of inquiry and classification when it is considered under the First Amendment of the United States Constitution, section 421 of the Beal Property Tax Law or its predecessor section 420, or under the local law. Distribution by sale of literature as a method of spreading the distributor’s religious beliefs has been held to be an exercise of religion under the. First Amendment. (Follett v. McCormick, 321 U. S. 573.)
Since the adoption of the First Amendment to the United States Constitution in 1791, the issue has been to what extent, if at all, the Federal or State Governments can regulate the *565 expression and practice of religion under the Free Establishment Clause. Thomas Jefferson explained what he conceived to he the meaning behind the amendment as follows: “Believing with you that religion is a matter which lies solely between man and his God; that he owes account to none other for his faith or his worship; that the legislative powers of the government reach actions only, and not opinions, — I contemplate with sovereign reverence that act of the whole American people which declared that their legislature should ‘ make no law respecting an establishment of religion or prohibiting the free exercise thereof, ’ thus building a wall of separation between church and State. Adhering to this expression of1 the supreme will of the nation in behalf of the rights of conscience, I shall see with sincere satisfaction the progress of those sentiments which tend to restore man to all his natural rights, convinced that he has no natural right in opposition to his social duties.” (T. Jefferson, 8 Jefferson’s Works 113, quoted in Reynolds v. United States, 98 U. S. 145, 164).
The Free Establishment Clause thus contemplates two distinct aspects of freedom of religion. The freedom to believe, to have opinions, and to accept the tenets of a certain religious organization, is absolute. (Sherbert v. Verner, 374 U. S. 398, 402 [1963]; Braunfeld v. Brown, 366 U. S. 599, 603-604 [1961] ; Torcaso v. Watkins, 367 U. S. 488 [1961]; Cantwell v. Connecticut, 310 U. S. 296, 303-304 [1940]; Davis v. Beason, 133 U. S. 333, 344 [1890]; Reynolds v. United States, 98 U. S. 145, 163, supra.) The Government, whether Federal or State, cannot force an individual to accept a religious belief repugnant to him. (Sherbert v. Verner, supra, p. 402; Torcaso v. Watkins, supra.) In Torcaso, the appellant had been appointed to the office of notary public in Maryland, but was refused commission to serve because he would not declare his belief in God. Nor can the government ‘ ‘ penalize or discriminate against individuals or groups because they hold religious views abhorrent to the authorities ”. (Sherbert v. Verner, supra, p. 402.) In addition, the manner in which sermons are delivered may not he approved of or regulated by the Government or the courts. (Fowler v. Rhode Is., 345 U. S. 67, 70 [1953].)
It was well said in the case of Abington School Dist. v. Schempp (374 U. S. 203, 231 [1963]), “ The fact is that the line which separates the secular from the sectarian in American life is elusive.” Further (p. 299), that “ the State must be steadfastly neutral in all matters of faith, and neither favor nor inhibit religion. ’ ’
*566 Petitioner was organized in 1909 at the direction of the general superior of the Jesuit order. The order’s headquarters are in Rome, Italy. Its basic purpose is to preach the gospel. The subject property is owned by petitioner. Numerous priests reside there and are directly involved with the conduct of several religious activities including, among others, production of two publications, the holding of Mass, conduct of the John La Farge Institute devoted tó ecumenical and interracial concerns. The evidence establishes that the Ecumenical Council of 1963-1965 issued “ The Decree of Instruments of Social Communications.” It directed that the church is dutybound to uphold and assist “ Catholic magazines * * * whose main purpose is to .spread and defend the truth and to strengthen the Christian texture of human society * * * to make Christian evaluations of all that happens.” Religious activity in respect of Catholic opinion and teaching is shown by the evidence as reflected in the Pastoral Instrument on Social Communication, as follows: “ It is the task of the Catholic press to balance, to complete and, if necessary, to correct the news and comments about religion and Christian life. At one and the same time it will be a glass that reflects the world and a light to show it the way. * * * It is hard to see how people can keep in touch with what is happening in the Church without the Catholic Press. Neither can people keep a Catholic attitude toward what happens in the world without the help of commentaries on the news, written in the light of Christian principles.”
As stated in Murdock v. Pennsylvania (319 U. S. 105, 109):
‘ ‘ This form of religious activity occupies the same high state under the First Amendment as do worship in the churches and preaching from the pulpits. It has the same claim to protection as the more orthodox and conventional exercises of religion.” The subject there, too, was the sale of religious literature by Jehovah’s Witnesses which was held to be a religious activity.
Difficulty arises with respect to adherence to the United States and State Constitutions when legislative action makes distinctions between religious activity and for example, Bible and tract organizations. There is danger in the creation of a purported dichotomy of mutually exclusive parts so that a Bible or tract organization is totally separated from religious activity. Thus, in Matter of Watchtower Bible & Tract Soc. of N. Y. (Lewisohn) (N. T. L. J., Jan. 30, 1973, p. 16, col. 1), property of the Jehovah’s Witnesses was held to be exempt from taxation under Local Law No. 46 of 1971, the court stating: “ Respondents contend that the subject properties are not tax exempt by *567 virtue of the fact that petitioner is not organized exclusively for religious purposes, but is, instead, engaged primarily for Bible, tract and missionary purposes. This contention completely overlooks the fact that the highest courts of the land have heretofore declared that petitioner is an organization organized for religious or educational purposes (People ex rel. Watchtower Society v. Haring, 8 N Y 2d 350; Murdock v. Pennsylvania, 319 U. S. 105; Jones v. Opelika, 319 U. S. 105).”
Tract, Bible, mission, are in no sense the exclusive purpose of America Press and of the Jesuits. The object of literary activity of America Press' and the Jesuits was enunciated in the first editorial announcement 'of the Catholic Weekly Magazine America as follows: 11 discussion of actual questions and a study of vital problems from the Christian standpoint, a record of religious progress, a defense of sound doctrine, an authoritative statement of the position of the Church in the thought and activity of modern life, a removal of traditional prejudice, a refutation of erroneous news, and a correction of misstatement about beliefs and practices which millions hold dearer than life. * * * The march of events is too rapid, and every week has its paramount interests which are lost or forgotten, unless dealt with as soon as they arise. * * * It will aim at becoming a representative exponent of Catholic thought and activity without bias or plea for special persons or parties. ”
The 1909 ordination was modified in 1966. The modification, it is said, was intended to reflect changes created by two World Wars, a vast social and cultural revolution and the effect of the Second Ecumenical Council. Hence, purpose was then specifically stated to be: “ The contemporary message of America magazine, as is clearly enunciated in the Ordination and has already been your policy, is addressed not only to the sons of the Church and to all who invoke the name of Christ but to the whole of humanity. The joys and hopes, the griefs and the anxieties of the men of this age, especially those who are poor or in any afflicted, are your apostolic concern. To carry out such a task America, in accordance with the Vatican II Council, must scrutinize the ¡signs of the times, interpret them in the light of the Gospel, and in language intelligible to the present generation give witness and voice to the faith of the whole people of God. This we do as Jesuits in conformity with the rules of St. Ignatius for thinking with the Church (Inter Mirifica n. 14; Gaudium et Spes nn. 1-4).”
Respondents quote portions of the publications which appear to be political tracts concerned with current events, domestic and foreign. The ¡suggestion is that the publications of America *568 Press are not at all unlike other communications media and, like them, enjoy no favorable consideration. This is not the place to sit in judgment upon the content and context of pulpiteering, necessarily a matter of controversy and differences of opinion. Essential religious motivation cannot be rejected out of hand as inimical to the American system or religious practice.
Of particular significance is the coupling ‘ of religious and literary character ’ ’ in classifying the nature of activity in relation to coverage pursuant to Local Law. (People ex rel. Seminary of Our Lady of Angels v. Barber, 42 Hun 27, 30, affd. 106 N. Y. 669.) It was there stated: “ The policy of the law has been, in this State from an early day, to encourage, foster and protect corporate institutions of religious and literary character, because the religious, moral and intellectual culture afforded by them were deemed, as they are in effect, beneficial to the public, necessary to the advancement of civilization, and the promotion of the welfare of society.” At least the distribution of literature for money does not preclude a conclusion that such distribution is an exercise of religion within the United States Constitution First Amendment (Follett v. McCormick, 321 U. S. 573, supra). Error is rampant when a myriad of activities considered in relation to religious exercise are held by mere ipse dixit to be mutually exclusive. The church, temple and synagogue are not so confined. This was the essential holding in Matter of Association of Bar of City of N. Y. v. Lewisohn (71 Misc 2d 401, 412), where the court stated:
6 ‘ The court holds that the categories of dedication of use of real property enumerated in section 421 (subd. 1, par. [b]) of the Real Property Tax Law and New York City Local Law No. 46 of 1971 are not mutually exclusive. This holding is the only way by which the constitutionality and validity of the statutes can be upheld.
“ Thus there is no necessary incompatability of dedication and use of real property simultaneously for ‘ religious, ’ ‘ bible, ’ and ‘ missionary ’ purposes, for ‘ hospital, ’ and ‘ infirmary ’ purposes, for ‘ charitable ’ and ‘benevolent ’ purposes, or for ‘ educational,’ ‘ scientific,’ ‘ literary,’ and ‘ library ’ purposes, to cite but a few of the many possible combinations.”
Some may quarrel with the expressions found in America’s works. Upon the evidence adduced it cannot be concluded that America Press is a separate, divisible nonreligious activity of the Jesuits. Nor is it debatable that the “ pulpit ” is extended through the instrument of the distributed literary works. There *569 cannot be valid distinction as to forms of religious expression as a foundation to discriminate in the arbitrary selection of the basis for withholding of tax exemption. Application of the religious, moral and philosophic concepts of the Jesuits and their relevance to the problems of modern society cannot be foreclosed. A broad view of the legislative concept of religious organization, and the lack of requirement for organization under the Religious Corporations Law by every organization engaged in religious activity, are reflected in subdivision (b) of EPTL 8-1.1 and in section 482-a of article 10-A of the Social Services Law.
Many organizations in addition to the church, temple and synagogue act as vehicles for the expression of religion. Moreover, an organization devoted to the mental or moral improvement of men and women is not necessarily a nonreligious function nor automatically to be excised from the concept of religious, activity. It is quite clear, therefore, that the pursuit of respondents’ arguments, as to the effect of the enabling act and the local law, would lead us to a meaningless, unworthy, fruitless quagmire. A chaotic situation arises by an attempt under section 421 and local law to change the meaning of the essential terms of the predecessor section 420. There is no legislative intent evinced, explicit or implicit, to change the accustomed interpretations of the terms found in section 420 when they were transferred to section 421.
Assuming, as respondents argue, that in the developing history of legislative changes regarding exemptions, Bible, tract and missionary were added as separate categories of activity, it does not follow, as urged, that separateness is essential and, in addition, that there is evidenced thereby an intention that such categories are not included in the term religious. On the contrary, in a particular case, each may constitute but one of several activities of a religious organization. Indeed, the evidence demonstrates convincingly that America Press is devoted solely to religious purpose and certainly not alone to Bible, tract or mission.
The testimony does not establish any diversion to public or other use. Nor does the testimony warrant a conclusion either that the activities of America Press are nonreligious or that the respective religious activities of the Jesuits in general and of America Press are mutually exclusive. The conclusion is ineluctable that the activities of America Press are inseparable from the religious activities of the Jesuit order and, together, they qualify for tax exemption.
*570 Tax exemption may not be based, as respondents seem to argue, upon the carving out of activities from a larger group. Bible, tract and mission when carved out as separate categories are no less religious. If religious can be regarded as pertaining to a so-called larger group, carving out the separate categories making up the group does not render the separated categories less religious. If the carved out activity takes the form of any of the communications media, it is not thereby divested of its original religious character as when fostered solely from the house of worship.
The subject property is held by a religious organization, regardless of the legal form in which it is held. It houses members of the church organization who, among other things, pray there and edit the publications as part of the work of the church as an extended arm of the pulpit. The operation is not shown to be commercial or operated for profit or in any way divorced from the Jesuit organization and its purpose. The court is hot called upon to say that what is thus published may not be uttered also from the pulpit as the word of the church. (People ex rel. Seminary of Our Lady of Angels v. Barber, 42 Hun 27, 30, affd. 106 N. Y. 669, supra.)
Some of respondents’ contentions run afoul of the Establishment Clause of the First Amendment of the United States Constitution. These relate particularly to the attempt to equate petitioner’s activity with general journalism. Sincerely held beliefs may result indeed in activities which affect the health, safety and general welfare. Thus, one of the basic tenets of the Mormon sect was declared to be an activity which could be regulated and prohibited as offensive and immoral according to the standards of the people and violative of peace and order. (Davis v. Beason, 133 U. S. 342, supra.) The dichotomy, here, is in the constitutional freedom of worship and in the freedom to practice a belief which in this context invokes also the freedom of speech as an adjunct to the religious activity. Thus, while not so appearing on its face, enforcement of the local law would impinge on petitioner’s religious activity and exemption from tax and its freedom to practice its beliefs through communications media. (Sherbert v. Verner, 374 U. S. 398, supra.) Such use in the circumstances here does not permit a determination that the purpose is secular. As observed in Walz v. Tax Comm. (397 U. S. 664, 673): “ Qualification for tax exemption is not perpetual or immutable; some tax-exempt groups lose that status when their activities take them outside the classification and new entities can come into being and qualify for exemption.”
*571 This petitioner qualifies as such new entity. While there is compelling need for the subject legislative enactments because of the diminishing tax base and inequality in the application of exemptions and payment of taxes, yet Local Law No. 46 of 1971 when applied to the petitioner will not support the imposition of tax.
The motion is granted. The petition is sustained and judgment is awarded to the petitioner.