In the Matter of the HOLY SPIRIT ASSOCIATION FOR THE UNIFICATION OF WORLD CHRISTIANITY, Petitioner, v TAX COMMISSION OF THE CITY OF NEW YORK, Repondent.

First Department, May 5, 1981

#### APPEARANCES OF COUNSEL

*Lester Nelson* of counsel *(Jeffrey W. Herrmann* and *Richard C. Ebeling* with him on the brief; *Miller, Montgomery, Sogi, Brady & Taft*, attorneys), for petitioner.

*Leonard Olarsch* of counsel *(Carlos M. Velazuez* with him on the brief; *Allen G. Schwartz, Corporation Counsel*, attorney), for respondent.

## OPINION OF THE COURT

BIRNS, J.

This is the second occasion for us to consider this CPLR article 78 proceeding by which petitioner seeks to review a determination by the New York City Tax Commission denying petitioner's application for exemption from real property taxes for three of its properties which were acquired in 1975.[1] Petitioner's application rests upon an assertion that it is organized and conducted exclusively for religious purposes and that its properties are used for such purposes.

On the first occasion *(Matter of Holy Spirit Assn. for Unification of World Christianity v Tax Comm. of City of N. Y.,* 62 AD2d 188) we held that although the proceeding was improperly transferred to the court because it did not involve a question of substantial evidence within the limitations of CPLR 7803 (subd 4) this court nevertheless would decide the proceeding rather than retransfer it. We were of the opinion that the test of review was whether the rejection of petitioner's claim for tax exemption by respondent Tax Commission was arbitrary and capricious *(Matter of Holy Spirit Assn. for Unification of World Christianity v Tax Comm. of City of N. Y., supra,* p 193). As we could not make an appropriate determination on the insufficient record before us, we remanded the matter to a Special Referee for a full examination of the facts respecting petitioner's purpose and the actual use to which the subject properties were being devoted *(Matter of Holy Spirit Assn. for Unification of World Christianity v Tax Comm. of City of N. Y., supra,* pp 197-198).

---

1. The Tax Commission by a 4 to 3 vote held petitioner's properties were subject to real property taxation. The majority concluded that petitioner failed to meet the burden of establishing that petitioner was organized or conducted exclusively for religious purposes (Real Property Tax Law, § 421, subd 1, par [a]). The majority found that "although the applicant association does in certain aspects bespeak of a religious association, it is in our opinion so threaded with political motives and activities that it requires us to deny the application * * * the political activity of the applicant is more than an incidental part of their operation." The dissenters considered themselves bound to accept petitioner's religious essence, and without power to delve into the validity of its beliefs. Neither opinion analyzed the second test of exemption—whether the premises themselves were being used exclusively for petitioner's religious purposes.

Following the mandate of this court the Special Referee conducted a hearing and rendered his report, appended hereto.

We have examined the Referee's report and reviewed the record. Upon such review we confirm the report insofar as it concluded that the Tax Commission's denial of tax exemption to petitioner's three properties was not "arbitrary or capricious".

In our previous opinion we noted that petitioner is organized under the General Nonprofit Corporation Law of the State of California. The properties which are now under review are as follows:

The former Columbia University Club, located at 4 West 43rd Street. That property had an assessed valuation of $1,025,000 in the 1975-1976 tax year. Its eight floors, the Tax Commission found, are used for sleeping quarters for its members, offices of petitioner's national headquarters and of an affiliate, the International Cultural Foundation, space for a film department, public affairs press service, dining room and lecture room; other areas are used for conferences, study and assemblies. One room is designated for prayer. At the time of application for exemption some commercial income was generated from storekeepers on the ground floor whom petitioner was attempting to evict. Those commercial tenancies have terminated, and petitioner occupies the entire premises.

A second Manhattan property at 305 West 107th Street is a five-story townhouse assessed in 1975-1976 at $34,000, which affords living and study quarters gratis for 11 members who attend nearby Columbia University and three other nonstudent members. The nonstudents proselytize and administer the building. The students may engage in prayer and "certain missionary type teaching." Lectures and discussions about the church take place at this property which petitioner considers a "church center".

The third parcel is located in the former Loft Candy factory at 38-38 Ninth Street, Long Island City in Queens County. Assessed at $1,555,000 in 1975-1976, that property houses petitioner's publications department where works

related to church doctrine will be printed. In addition, church vehicles are repaired and various construction supplies and church archives are stored there.

## I

Testifying at the Referee's hearing were members of the Unification Church, including Neil Salonen, its president. Representatives of five different religious or religiously affiliated organizations also testified on behalf of petitioner, as did Frederick Sontag, a professor of philosophy and "expert" on the Unification Church, and Margaret Deboe, an associate from an accounting firm employed by the church. Two former members of the church, Allen Wood and Robert Brandyberry, testified for respondent.

Introduced into evidence, *inter alia*, were Reverend Sun Myung Moon's writings and a training manual for church members.

The members of the church testified as to their religious beliefs and their dedication to the teachings of Reverend Moon, the leader of the church. They described also their activities for the church and at the subject properties. They told of their prayer meetings, discussion groups, fund raising and evangelical duties.

Thomas Ward, a church member residing at 4 West 43rd Street, initially testified that his associates engaged in no fund raising but subsequently conceded that church members had been requested to participate in "mobile fund raising". He also explained that members resident at the 4 West 43rd Street property were expected to engage in evangelical work. Deboe testified that the Unification Church did not actively fund any political or economic activities, but conceded that over $20,000 of petitioner's checks were made out to cash every month.

Through representatives of the United Jewish Appeal, Mormon Church, Baptist Church, Eastern Catholic Rite and the National Council of Churches petitioner sought to maintain that the Unification Church was a religious organization and that its political and economic activities were no different from those of other religious organizations.

Wood and Brandyberry testified as to their church activities, which included fund raising and political ventures, and explained that people were mobilized from the church and its various affiliates for a variety of political and economic purposes. The Referee credited the testimony of Wood and Brandyberry.

At the conclusion of the hearing, the Referee reported that petitioner's primary purpose is religious, but that petitioner's theology, as expressed in Reverend Moon's writings binds it to a course of political activity and that the subject properties were not used for religious purposes. The Referee cited several tenets of the Unification Church, such as the opposition to the separation of church and State and the republican form of government—a position which he considered to be inherently political. The Referee found that much of petitioner's energy was directed towards political and economic activity, fund raising and recruitment. He discussed some of the activities engaged in by petitioner's "cadre", and rejected petitioner's claims that these were religious and not political activities. The Referee also concluded that church members are often deployed in a number of other organizations affiliated with the church, such as The Freedom Leadership Foundation, Professor's World Peace Crusade, Korean Cultural and Freedom Organization, International Cultural Foundation, Collegiate Association for the Research of Principles and the Christian Political Union, and that many of these organizations engaged in political activities. These political activities include the following:

1. A mass rally in Washington, D.C. in support of President Nixon at the time that the House of Representatives took up the issue of his impeachment;

2. A training program to indoctrinate church leadership with respect to political issues, including the idea that Nixon had "providential standing" as President;

3. Maintaining an office in Washington, D.C. for political purposes;

4. Using the afore-mentioned affiliates to oppose certain legislation and to stage anticommunist and other political rallies.

He further found that not only are church members engaged in fund raising and deployed in the many businesses held by the church, such as International Oceanic Enterprises, Inc., News World Communications, Inc., One-Up Enterprises, Inc., but that Reverend Moon and church officers, including the church president, Neil Salonen, held directorships and other offices in these corporations. The Referee concluded that Reverend Moon exerted centralized control over all the operations, and that church members were regularly assigned to perform other duties.

The Referee reported that the building at 4 West 43rd Street served as a center for all petitioner's activities, religious and otherwise, that the building at 305 West 107th Street was used primarily for missionary activities, and that the property in Long Island City was used primarily for commercial purposes.

At the conclusion of his report, the Referee stated: "The evidence at the hearing established that petitioner's religious purposes are intertwined with political and economic objectives that form an amalgam that is served by a cadre of full-time church-supported administrators and workers that are shifted at will by some undefined directive force from religious to other purposes. Under such circumstances, there is a rational basis for respondent's determination and substantial evidence to support that determination."

## II

Petitioner challenges the conclusion of the Referee that the Tax Commission's denial of tax exemption to petitioner's three properties was not arbitrary or capricious. It is petitioner's claim that inasmuch as the Referee found that petitioner was organized primarily for religious purposes, it is entitled to the exemption contained in section 421 of the Real Property Tax Law.[2] Petitioner maintains that the

2. Section 421 of the Real Property Tax Law, in pertinent part, reads as follows: "1. (a) Real property owned by a corporation or association organized or conducted exclusively for religious, charitable, hospital, educational, moral or mental improvement of men, women or children or cemetery purposes, or for two or more such purposes, and used exclusively for carrying out thereupon one or more of such purposes either by the owning corporation or association

Referee's finding that petitioner was not entitled to such exemption was based upon an impermissible analysis of the creed and belief of petitioner, in violation of Federal and New York State constitutional guarantees; that the Referee's finding that petitioner's religious purpose is intertwined with political and economic objectives is erroneous; and finally, that the Referee, in precluding evidence of the political and business activities of other tax exempt institutions and religious organizations, denied petitioner equal protection of the laws.

Respondent would have us confirm the report of the Referee except that portion wherein he found that petitioner's primary purpose was religious. It is respondent's position that the credible evidence establishes that petitioner's primary purpose is political, that its political activity undermines its claim that it is devoted primarily to religion, that the subject properties were not used primarily for religious purpose, and that the denial of exemption from real estate taxes does not violate the Federal and State Constitutions.

## III

Generally, New York courts will look with favor upon a Referee's report, inasmuch as the Referee, as trier of fact,

---

or by another such corporation or association as hereinafter provided shall be exempt from taxation as provided in this section.

"(b) Real property owned by a corporation or association which is not organized or conducted exclusively for religious, charitable, hospital, educational, moral or mental improvement of men, women or children or cemetery purposes, or for two or more such purposes, but which is organized or conducted exclusively for bible, tract, benevolent, missionary, infirmary, public playground, scientific, literary, bar association, medical society, library, patriotic or historical purposes, for the enforcement of laws relating to children or animals, or for two or more such purposes, and used exclusively for carrying out thereupon one or more of such purposes either by the owning corporation or association, or by another such corporation or association as hereinafter provided, shall be exempt from taxation; provided, however, that such property shall be taxable by any municipal corporation within which it is located if the governing board of such municipal corporation, after public hearing, adopts a local law, ordinance or resolution so providing. None of the following subdivisions of this section providing that certain properties shall be exempt under circumstances or conditions set forth in such subdivisions shall exempt such property from taxation by a municipal corporation whose governing board has adopted a local law, ordinance or resolution providing that such property shall be taxable pursuant to this paragraph (b)."

is considered to be in the best position to determine the issues presented. Courts will confirm a Referee's report to the extent that the record substantiates his findings and they may reject findings not supported by the record *(Florio v Florio,* 143 NYS2d 105; *Industrial Installations Corp. v Sparer,* 74 NYS2d 198).

■ On the record before us, we reject the Referee's finding that petitioner's primary purpose is religious. We are not required to go so far, as respondent urges, as to find petitioner's primary purpose political. Rather, we conclude that political and economic theory is such a substantial part of petitioner's doctrine that it defeats petitioner's claim that its primary purpose is religious. Accordingly, we hold, in agreement with the Referee, that respondent's denial of tax exemption to petitioner was not arbitrary or capricious and should be confirmed.

■ ■ Tax exemptions found in statutes, are matters of legislative grace. Taxpayers have the burden of establishing their entitlement to exemptions *(Dickinson v United States,* 346 US 389). The courts have held that in order to be entitled to an exemption under section 421 of the Real Property Tax Law an applicant must establish: 1) that it is organized or conducted exclusively for religious purposes; and 2) that the premises are used exclusively for those purposes. It is insufficient for an organization merely to be organized or conducted exclusively for religious purposes; the statute also requires that the property be used exclusively for religious purposes. However, in determining whether an organization is entitled to tax exemption, the word "exclusive" has been construed to mean principal or primary *(Matter of Association of Bar of City of N. Y. v Lewisohn,* 34 NY2d 143, 153). Thus there devolves upon an applicant for tax exemption under section 421 of the Real Property Tax Law a conjunctive burden to establish that it has met the two requirements of the law.[3]

■ We are compelled to conduct a broad inquiry into

3. The fact that the petitioner received tax exemption from the IRS is not determinative of the issue of whether petitioner is entitled to a tax exemption under the Real Property Tax Law *(Matter of Swedenborg Foundation v Lewisohn,* 40 NY2d 87).

petitioner's doctrine and activities in order to determine whether petitioner qualifies for the tax exemption provided by law.[4] We recognize, however, that any judicial analysis of a religion is a sensitive and perilous undertaking where it is addressed to the relationship of church and State. For this reason, courts are loath to inquire into the merits or truth of any set of purportedly religious beliefs. We too will not trespass in this area.

Courts can and will, however, examine such beliefs to determine whether they exhibit the minimum requirements of a religion (*Matter of Watchtower Bible & Tract Soc. of N. Y. v Lewisohn*, 35 NY2d 92; *Matter of Swedenborg Foundation v Lewisohn*, 40 NY2d 87; *Christian Echoes Nat. Ministry v United States*, 470 F2d 849, cert den 414 US 864). The statement of Chief Justice HUGHES in his dissent in *United States v Macintosh* (283 US 605, 633-634) has emerged as a basic guide: "The essence of religion is belief in a relation to God involving duties superior to those arising from any human relation."

The definition has been applied liberally, particularly in our modern age when new and unorthodox religious societies and organizations have appeared. Unorthodoxy will not serve to disqualify a religious group from tax exemption, as long as the group holds a sincere and meaningful belief in God occupying in the life of its possessors a place parallel to that occupied by God in traditional religions, and dedicates itself to the practice of that belief (*United States v Seeger*, 380 US 163, 165).

A threshold examination of Reverend Moon's Divine Principle, which the Unification Church regards as a religious revelation and testament, reveals that a significant

---

4. We are required to question petitioner's primary purpose, as we directed the Referee to do. In addition, we shall question the uses to which its properties are devoted. We would have preferred to rest our determination on the "uses" branch of the inquiry, but we note that the Tax Commission did not in its decision reach that branch in rejecting petitioner's application for exemption. Nevertheless, it was appropriate that we examine that branch as well because, if the evidence failed to sustain the first branch—the primary purpose of petitioner—we would then be required to choose between the remedy of a remand to the Tax Commission or an outright direction that petitioner is entitled to the exemption. This choice would depend on whether evidence existed or not to support a rejection of the exemption on grounds of uses to which the properties were devoted.

portion of the work is devoted to an elaborate and complex exegesis on the relationship between Man and God and how God acts upon the world.

Among the critical concepts in the doctine are Man's fall, the evil of Satan's machinations in history from biblical times to the present, Man's eventual restoration, and the coming of the Second Messiah. The doctrine defines its teachings as Christian, accepts the truth of the Judaic Bible and Christian Gospels, and asserts that these teachings will eventually unify all Christians and complete the unfinished business of Christianity.

Through testimony, Unification Church members assert belief in the doctrine's exposition of the nature of the relationship between God and Man. These witnesses apparently devote much time to prayer and study of the doctrine.

To the extent that this doctrine purports to establish a belief in the relationship between God and Man, and to the extent that church members pattern their behavior upon duties arising from this relationship, the Unification Church does meet Chief Justice HUGHES' minimal test for religion. Accordingly, this court can conclude that one of its purposes is religious. However, to qualify for an exemption, the church must establish that it is organized or conduted primarily for religious purposes *(Dickinson v United States, supra; Christian Echoes Nat. Ministry v United States, supra,* at p 854).

Although petitioner's certificate of incorporation emphasizes its religious purpose and restricts nonreligious activities, other factors should be examined *(Matter of Mary Immaculate School of Eagle Park v Wilson,* 73 AD2d 969; *Christian Echoes Nat. Ministry v United States, supra).* We recognized the propriety of such analysis when we wrote: "In searching for the primary purpose of the petitioner * * * not only must we look for the connection with an organized religion * * * but also we should analyze petitioner's activities for their generic religious content * * * [T]he respondent is not required under section 421 of the Real Property Tax Law to exempt an organization whose activities are generically anything but religious merely because the taxpayer says that those activities are among its theological doctrines." *(Matter of Holy Spirit*

*Assn. for Unification of World Christianity v Tax Comm. of City of N.Y., supra*, p 197.)

Further examination of the Divine Principle reveals that church doctrine is not confined to religious matters. As the Referee found, "[t]he petitioner believes that the physical world consisting of science and economics as well as the spiritual world consisting of religion have developed in accordance with 'God's providence' and that 'religion and economy relate to social life through politics.' " (Divine Principle, p 433.) Just as Karl Marx viewed all history through the prism of dialectical materialism,[5] so does this doctrine interpret historic economic and political events in accordance with its religious theories of fall, redemption and restoration.

In the course of its religious interpretation of history, a considerable portion of the doctrine espouses the relative merits and disadvantages of monarchy, democracy, capitalism and republicanism, views world leaders as religious protagonists and declares and opposes the separation of powers practiced in most modern democracies to be the workings of Satan on Earth *(id.,* p 469). Similarly, it professes that Satan not only exploits separate but coequal branches of government to accomplish his evil *(id.,* p 443) but has marshaled the powers of Communist doctrine and the Communist countries in support of the diabolical forces leading to the downfall of man. According to the doctrine, mankind's only hope for redemption is to ready itself for the Second Advent of the Messiah by creating a centralized

5. A philosophy enunciated by Karl Marx and Frederick Engels, which propounded that every society is composed of different interacting forces, and that social change comes about when antagonistic elements interact explosively at a critical point in the society's development in such a way as to create a completely new social order, the laws of which are contrary to the laws of the prior system. This process of change is considered to be part of a unified, logical and necessary unfolding of history. "This philosophy, formulated by Karl Marx and Frederick Engels was * * * the basis for their economic and historical theories. According to this standpoint, the evolution of all social systems conforms to the * * * laws of dialectic—the unity and struggle of opposites, the transformation of quantity into quality and the negation of negation * * * [W]hat Marx's dialectic affirms is that every society is a system of interactive forces which evolves abruptly at some critical point of the society's development into a qualitatively new system, the laws of which are the contraries of the previously existent social laws". (Encyclopedia Americana [1959 ed], vol 9, p 58 [Lewis S. Feuer, Prof of Philosophy, U of Vt].)

political system in Korea under the stewardship of one man *(id.,* p 471).

The fact that religious and nonreligious themes are inextricably intertwined in the doctrine is evidenced in the following excerpt from Reverend Moon's teachings: "Through the religion of the new truth which can solve the problems of religion and science under one unified theme there will come a political society in which all mankind having been unified into the heart and bosom of God, will realize the ideal of creation on the economic foundation centering on God's ideal. This is the true messianic kingdom based on the principle of co-existence, co-prosperity and common cause." *(Id.,* p 446.)

Therefore, despite the religious content of the doctrine, and the leitmotif of religion with which the eclectic teachings are tinged, the doctrine, to the extent that it analyzes and instructs on politics and economics has substantial secular elements. The mere use of religious terminology in connection with politics and economics will not obscure the traditionally nonreligious nature of these fields. Petitioner, by undertaking an adventure in semantics, is attempting to cloak politics and economics with the blanket of religious dogma. Given the equally strong roles that politics, economics and religion play in petitioner's doctrine, we do not agree with and we reject the Referee's finding that petitioner's primary purpose is religious.

The training and activities of the church members serve as further evidence that religion is not petitioner's primary purpose, but only one of several discrete purposes. The training manual used at Ken Sudo's training course for church members contains explicit and numerous instructions on equal amounts of political, economic and religious matters and does not differentiate between the religious and secular spheres. All secular acts are to be done in the name of God. Despite petitioner's attempts to disavow this manual, the preponderance of the credible evidence establishes its importance in preparing neophytes and retraining seasoned members.

The testimony of Wood and Brandyberry supported the Referee's conclusion that the church was involved in many political and economic activities in which church members

were often deployed. While church members denied political and economic involvement, they conceded in testimony that their beliefs led them to view politics, economics and religion as an integrated unit. It appears, too, that although the church's affiliates perform its political activities, the bar separating the church from its affiliates is sufficiently flexible to allow utilization of each other's personnel and materiel wherever and whenever required. Furthermore, as the Referee reported, the evidence showed that church officers often held leadership positions in the church's political and economic affiliates.

The emphasis upon politics and economics in the church doctrine and training program, the fact that church leaders often hold positions in nonreligious affiliated organizations and that church members apparently can be and are deployed in any number of religious and nonreligious activities demonstrate that the Unification Church is deeply involved in nonreligious activities. These activities are substantial enough to support the finding that petitioner is not organized or conducted primarily for religious purposes.

Petitioner asserts that its nonreligious activities are really incidental and insignificant to its primary religious purpose. We have held that: "[P]urposes or characteristics which are incidental or peripheral in nature to the main or primary purpose will neither defeat the exemption, nor on the other hand, will they qualify the taxpayer for exemption." *(Matter of American Bible Soc. v Lewisohn,* 48 AD2d 308, 311, affd 40 NY2d 78; see, also, *Matter of Association of Bar of City of N. Y. v Lewisohn, supra.)* A recapitulation of the evidence supports a finding that the nonreligious activities are not merely incidental or peripheral to a primary religious purpose, but are integral, inextricable and equally important at the religious activities to the mission of the Unification Church. (Compare *Gospel Volunteers v Village of Speculator,* 29 NY2d 622; *Greater N.Y. Corp. of Seventh-Day Adventists v Town of Dover,* 23 NY2d 682.)

Our view is supported by the holding in *Christian Echoes Nat. Ministry v United States* (470 F2d 849, *supra)* in which a judicial inquiry, similar to the one in this case

was made. Petitioner in that case, seeking a tax exemption under provisions of the 1954 Internal Revenue Code (US Code, tit 26, § 501, subd [c], par [3]), had stated that its religious mission was a battle against political liberalism and actively appealed to the public to respond in monetary and other ways to church inspired anti-Communist campaigns. The Tenth Circuit found that petitioner was properly denied a tax exemption despite its professed religious beliefs, because its political participation was substantial and not incidental to its religious purposes. The rationale of *Christian Echoes* is particularly appropriate here.

## IV

Were we to find that petitioner's primary purpose is religious and that its political and economic activities are merely incidental, petitioner has not established that its premises are being used for such purposes so as to be entitled to an exemption under section 421 of the Real Property Tax Law. To the contrary, the record supports the Referee's findings that these properties are not used for tax exempt purposes. As noted earlier, the Tax Commission did not expressly determine this issue[6] although the record reflects that the uses of the three properties were the subject of testimony at that proceeding.

4 West 43rd Street, an eight-story edifice, is the Unification Church's headquarters. One room is designated for worship. The remainder of the structure serves as center for the other activities conducted under the church's aegis. Thus, with respect to usage, we are concerned with the question whether a tax exemption should be granted to an eight-story structure, one room of which is denominated for worship. In this connection, we note that Mr. Salonen testified before the Tax Commission, and the proof before the Referee supports this testimony, that the buildings on 43rd Street and 107th Street are used to house missionaries.

Under the statute, missionary activities are entitled to exemption only when a local law so provides (Real Property Tax Law, § 421, subd 1, par [b]). However, the Administrative Code of the City of New York affords petitioner

---

6. See Footnotes 1 and 3.

no relief (§ J51-3.0).[7] Furthermore, when an organization is conducted in New York City for missionary purposes, it is subject to real property taxation (see *Matter of Watchtower Bible & Tract Soc. of N.Y. v Lewisohn*, 35 NY2d 92, *supra*).

Finally, the record shows that the property at 38-38 Ninth Street, Long Island City, was used primarily for commercial purposes. Petitioner does not deny this but argues that it intended to use the property for exempt purposes. There is no evidence supporting this assertion. The actual use to which the property was put is sufficient evidence of intended use, as the Referee concluded.

Petitioner also asserts constitutional objections to the Referee's report and would demand the protection of the free exercise clause of the First Amendment and the equal protection clause of the Fourteenth Amendment.

As we have noted, courts can, without constitutional infringement, properly analyze a religious creed solely to determine whether it has religious content, but not to determine the truth of its theology *(United States v Macintosh*, 283 US 605, *supra)*. Just recently, our Court of Appeals observed "[a]lthough the Society is concededly entitled to First Amendment protection as a religious organization, this does not entitle it to immunity from reasonable government regulation when it acts in purely secular matters" *(Matter of Society for Ethical Culture in City of N.Y. v Spatt*, 51 NY2d 449, 456).

The Referee made no finding as to the truth of petitioner's

---

7. "§ J51-3.0 Taxation of property of non-profit organizations, pharmaceutical societies and dental societies.—1. Real property owned by a corporation or association which is not organized or conducted exclusively for religious, charitable, hospital, educational or cemetery purposes, or for two or more such purposes, but which is organized or conducted exclusively for the moral or mental improvement of men and women or for bible, tract, benevolent, missionary, infirmary, public playground, scientific, literary, bar association, medical society, library, patriotic or historical purposes, for the enforcement of laws relating to children or animals, or for two or more such purposes, and used exclusively for carrying out thereupon one or more of such purposes either by the owning corporation or association, or by another such corporation or association as provided in paragraph (d) of subdivision one of section four hundred twenty of the real property tax law in chapter four hundred fourteen of the laws of nineteen hundred seventy-one, also designated as paragraph (d) of subdivision one of section four hundred twenty-one of the real property tax law in chapter four hundred seventeen of the laws of 1971, shall be taxable."

doctrine, but merely made a finding as to its inherent religious content. Such an examination is not only permissible but essential if courts in applying a statute are required to distinguish between religious and nonreligious activity.

By denying petitioner tax exemption, this court is not limiting petitioner's freedom to practice its beliefs and disseminate its doctrines; rather, it is merely declaring that petitioner is not organized and conducted in the manner required by law to entitle it to a tax exemption. There is no basis for petitioner's claim that it is denied equal protection of the laws for there is no showing of an arbitrary or invidious classification designed to intrude upon petitioner's rights *(Matter of Association of Bar of City of N. Y. v Lewisohn*, 34 NY2d 143, 156, *supra)*, or that the statute has been applied to petitioner in a discriminatory manner.

Petitioner also asserts that the Referee wrongfully barred evidence of the political and business activities of other exempt organizations. This claim is unwarranted. First, several representatives of other religious and exempt groups did so testify. Second, the Referee was not directed to determine the propriety of issuing tax exemptions to other organizations, but was to ascertain whether the Tax Commission properly found that the Unification Church was not entitled to such exemptions. Therefore, the Referee was not required to inquire into the activities of other exempt religious groups.

In rejecting the report of the Referee as to petitioner's primary purpose, we find that although religion is one of petitioner's purposes, it is not its primary purpose. Furthermore, the evidence supports a finding that the subject properties are not being used primarily for exempt purposes.

We reject also Justice SANDLER's contention (p 82) that the Unification Church is "indisputably religious in character, constituting a religious creed analogous to that of several well-known Protestant churches", and that petitioner's avowed purpose meets the definition of religion set forth by Mr. Chief Justice HUGHES in *United States v Macintosh (supra)*.

His dissent fails to document, with any illustration, a

religious organization or institution afforded tax exemption where political or economic activity or belief can be found in its dogma. We recognize that many churches and synagogues through their ministries espouse political and economic opinions, in instances when it is believed the expressions of such opinions are required.

The expressions of such opinions, however, are collateral to doctrinal beliefs. We could not, nor would we, preclude the expression of such opinions. The Constitution (1st Amdt) perpetually protects the expression of political and economic beliefs whether from a speaker on the sidewalk or a preacher in the pulpit. In any event, this appeal does not raise an issue of freedom of speech.

The dissent argues (p 84) further that petitioner should be afforded exemption from taxation under the Real Property Tax Law (§ 421) because "many religious institutions * * * have been engaged directly in more systematic and substantial social and political action than this record establishes with regard to petitioner." A brief answer may be found in the responsibility which devolves upon the Tax Commission to constantly re-examine tax exempt status to determine whether or not such immunity from taxation should continue (NY City Charter, ch 7, § 153, subd b).

Not only is the statute which affords tax exemption to be strictly construed, but its application by municipalities should be consistent with a legislative intent "to stem the erosion of municipal tax bases by permitting local governments to terminate exemptions for nonprofit organizations other than those conducted exclusively for religious, educational, charitable, hospital or cemetery purposes" *(Matter of Association of Bar of City of N. Y. v Lewisohn,* 34 NY2d 143, 155-156, *supra)*. We believe that we have demonstrated that the petitioner's primary purpose was not religious.

The dissent's reliance upon *Matter of America Press v Lewisohn* (74 Misc 2d 562, affd 48 AD2d 798) is misplaced. It is quite clear in *America Press (supra)* that the real property in issue was being used primarily as a residence for priests and the holding of church services. It is equally clear that the ecumenical and interracial concerns of the religious order owning the real property and the publica-

tion of the weekly magazine *America* were subordinate to the primary or principal religious purpose of the order.

The record before us fails to demonstrate that any of the subject premises were used primarily for church services or as a residence for those engaged in the ministry of the church.

A final observation with respect to the concurrence of my brother KUPFERMAN: one need not have misgivings that the tax laws make no provisions for Tom Paine and others inclined "to do good". Their kind of charity qualifies for exemption under section 421 (subd 1, par [a]) of the Real Property Tax Law. (See *Young Men's Philanthropic League v Tax Comm. of City of N. Y.*, 80 AD2d 775.) In any event, no claim is made here, and the record does not show, that petitioner is organized or conducted for "charitable purposes".

Accordingly, the report of the Referee dated August 25, 1980 should be confirmed insofar as it concluded that the determination of the Tax Commission denying tax exemption to petitioner's three properties in New York City was not arbitrary or capricious and the determination of the respondent dated September 21, 1977 denying petitioner's application under section 421 of the Real Property Tax Law for exemption from real property taxes should be confirmed, both without costs and without disbursements.

KUPFERMAN, J. P. (concurring). While I am impressed by the opinion of the court as expressed by my valued colleague Judge BIRNS, I hark back to the words attributed to Thomas Paine: "My country is the world, and my religion is to do good."

I cannot say that the petitioner is not primarily engaged in or organized for *its own* religious purposes. However, in view of the decision in *Matter of American Bible Soc. v Lewisohn* (40 NY2d 78 [affg the 3-2 decision of our court, 48 AD2d 308, dissent at p 315]) I must concur in the result.

If an organization engaged in the distribution of the Holy Bible, the "abecedarium" of Judaism and Christianity, is not entitled to a religious exemption, then I am hard put to conclude that this petitioner should receive a religious exemption. Moreover, the usage to which the premises involved are put also militates against an exemption.

SANDLER, J. (dissenting). For the reasons set forth in the admirable dissenting memorandum of the Tax Commission's minority, I would grant the petition and annul respondent's determination denying the application for exemption of certain of petitioner's properties from real estate taxes.

I do not agree with the view of the court majority that petitioner was not organized primarily for religious purposes. This conclusion depends upon dubious, unacceptably restrictive assumptions concerning the nature of religion and religious purposes, assumptions that if applied in an even-handed way, as the Constitution mandates that they must be, would be incompatible with the continued tax exempt status of property owned by many long-established and well-recognized churches and religious institutions. (See, e.g., *Matter of America Press v Lewisohn*, 74 Misc 2d 562, affd 48 AD2d 798.)

The court's opinion adequately summarizes for purposes of this appeal the principal doctrines to which petitioner subscribes. These seem to me indisputably religious in character, constituting a religious creed analogous to that of several well-known Protestant churches.

Although acknowledging that these doctrines are religious in part, the opinion of this court finds in some of the writings around which petitioner's church is formed "secular elements," supporting its conclusion that petitioner has not been organized primarly for religious purposes. The opinion describes as illustrative of the secular elements in petitioner's doctrinal beliefs the following from Reverend Moon's Divine Principle: "Through the religion of the new truth which can solve the problems of religion and science under one unified theme there will come a political society in which all mankind having been unified into the heart and bosom of God, will realize the ideal of creation on the economic foundation centering on God's ideal. This is the true messianic kingdom based on the principle of co-existence, co-prosperity and common cause."

I confess to some perplexity that a majority of this court should regard as secular what seems to me a quite familiar, unremarkable expression of a religious view, held by many

religions throughout history, and adhered to by a number of well-established churches. The view expressed in the quoted passage, as well as in other passages referred to in the majority opinion, fits quite precisely within even that somewhat restrictive definition of religion set forth by Mr. Chief Justice HUGHES in *United States v Macintosh* (283 US 605, 633-634) which the opinion of this court describes as a "basic guide." "The essence of religion is belief in a relation to God involving duties superior to those arising from any human relation." (Compare *United States v Seeger*, 380 US 163; *Fellowship of Humanity v County of Alameda*, 153 Cal App 2d 673.)

Indeed the principle embodied in the quoted language is not only religious in character but it is implicit in the central doctrine of all messianic faiths, each of which in one form or another anticipate a climactic event when the Messiah will return to this world, a final struggle between good and evil will occur, and the Kingdom of God will be reestablished on earth. It is hardly a surprising concept that this momentous event will be attended by dramatic, radical changes in all human institutions. To interpret such a doctrine as secular, and not religious, seems to me to distort beyond recognition the meaning of the word religion.

No doubt a different issue would have been presented if petitioner were shown to have contemporaneously engaged in a significant effort to change here and now our political, social and economic institutions. The record discloses little, if indeed any, evidence of such activity other than that implicit in the teaching of petitioner's basic doctrinal principles.

In his thoughtful report, the Referee sustained the action of the Tax Commission on the basis of a somewhat different analysis than that set forth in the court's opinion. The Referee found, correctly in my view, that petitioner was in fact organized primarily for religious purposes. However he went on to sustain the Tax Commission's determination on the basis of the following analysis: "The evidence at the hearing established that petitioner's religious purposes are intertwined with political and economic objectives that form an amalgam that is served by a cadre of full-time church-supported administrators and workers that

are shifted at will by some undefined directive force from religious to other purposes. Under such circumstances, there is a rational basis for respondent's determination and substantial evidence to support that determination."

When the evidence adduced at the hearing is evaluated in the light of even-handed principles, the Referee's conclusion seems to me ultimately untenable. Preliminarily, the quoted language of the Referee implies a far greater range and diversity of political and social activity attributable to the petitioner, or separate organizations formed by its members, than the record supports. Pertinent here are two aspects of petitioner's doctrinal beliefs.

First is petitioner's view of communism, variously expressed in the doctrinal writings, as a contemporary embodiment of evil and accordingly a force that must be strenuously opposed in every possible way.

The second is the special significance attached to Korea, the homeland of Reverend Moon, which is seen as the center of a religious development destined to have extraordinary historic significance.

Even as to these two doctrinal concerns, the record does not disclose more than the most incidental social and political action by petitioner itself or use of the church properties at issue here. Although petitioner was limited in its effort to develop in this record comparable activities of other religious institutions in what seems to me the one seriously questionable ruling by the Referee in what was otherwise an admirably conducted hearing, I have no doubt that many religious institutions, the tax exempt status of whose properties has never been questioned, have been engaged directly in more systematic and substantial social and political action than this record establishes with regard to petitioner.

The record does establish that core members of petitioner have organized, allegedly with nonmembers, autonomous organizations that in varying ways have addressed petitioner's concerns with the struggle against communism and have exhibited a special sensitivity to issues bearing on the welfare of Korea. In this respect petitioner does not appear to be essentially different from other churches whose members have formed separate organizations to act with regard to social and moral issues related to the doctrinal principles

of the churches but which are not specifically religious in character.

The Tax Commission has not invited our attention to any precedent for evaluating the activities of such groups, however closely linked to churches and religious bodies, as though their actions were the actions of the churches themselves.

The distinction apparently drawn by the Referee is based on evidence indicating that what are described as "core" members of petitioner are assigned from time to time to one or another of these autonomous organizations under circumstances not fully explained by petitioner and which might reasonably be thought to be in response to directions from senior church officials. I doubt that this is a legally significant difference. Surely there is little reason to believe that autonomous organizations formed by active members of other churches, often with direct participation of clergy, were not formed in response to the wishes of church officials or do not receive guidance from such authorities.

What may more truly distinguish petitioner from other churches is the strenuous effort to have such separate organizations function separately from petitioner, an effort that may well reflect petitioner's awareness of its special vulnerability because of its controversial character. The record discloses a substantial, apparently largely successful effort, to avoid using petitioner's church property or facilities to assist in the work of these separate organizations. Notably these organizations, or at least the principal ones, have been independently accorded a tax exempt status by the Internal Revenue Service after what appears to have been careful examinations of their operations.

On balance, the record does not support the Referee's conclusion that the activity of separate organizations inspired by petitioner, and in part formed by its members, should be viewed for purposes of tax exemption of petitioner's properties as the activities of petitioner itself. Inevitably this approach, if sustained, would invite, and perhaps require close scrutiny of the relationships between many other churches and organizations formed by the members of such churches, a scrutiny whose consequences are not likely in my view to be constructive.

As the Referee implicitly noted in the course of the hearings, petitioner is an extremely controversial organization. We are of course aware of a wide range of charges that have been directed against petitioner which have been widely publicized in the media. It should be stated explicitly that very little evidence bearing on such matters was presented at this hearing, perhaps because of a view that these matters were not relevant to the issues presented.

I am persuaded that the denial of tax exemption to petitioner cannot be reconciled on the basis of evenly applied standards with the tax exemptions that have long been enjoyed and continue to be enjoyed by many other churches. Many illustrations could be given, but two should suffice to make the point.

In the aftermath of the Second World War, there took place in this country an historic social and political struggle to eliminate every vestige of officially sanctioned or supported racial segregation. A leading role in that struggle was assumed by numerous churches throughout the country in what was a major sustained effort to end practices that were deemed an affront to basic religious teachings concerning the dignity of human beings. If the principles here applied to petitioner had been applied to many of those churches, I fail to see how their tax exemptions could have survived. It surely is not necessary to add that the granting or denial of tax exemptions may not properly turn on the popularity or social acceptance of the religious institutions, or on the degree of popular support for the principles they advocate.

The second example derives from a case ultimately decided in this court. *(Matter of America Press v Lewisohn,* 74 Misc 2d 562, affd 48 AD2d 798, *supra.)* At issue was the denial by the Tax Commission of an exemption for real property owned by an arm of the Jesuit Order of the Roman Catholic Church which was used primarily for the publication of two magazines whose content consisted (at p 563) "primarily of articles on nonreligious topics reflecting petitioner's viewpoints on political and economic issues."

In a notable opinion, sustaining the claim for tax exemption on the property so used, the trial court made the

following compelling, here pertinent, observations (at pp 568-569) : "There cannot be valid distinction as to forms of religious expression as a foundation to discriminate in the arbitrary selection of the basis for withholding of tax exemption. Application of the religious, moral and philosophic concepts of the Jesuits and their relevance to the problems of modern society cannot be foreclosed."

In affirming, this court did so explicitly on the opinion of the trial court. The principle underlying that decision mandates a similar result here.

Accordingly, the report of the Referee dated August 25, 1980, which found that the decision of respondent, denying a real estate tax exemption was neither arbitrary nor capricious, should not be confirmed, and a judgment should be entered annulling and setting aside the determination of the respondent and directing that petitioner's applications for exemption from real estate taxes for the year in question should be granted.

SULLIVAN and LUPIANO, JJ., concur with BIRNS, J.; KUPFERMAN, J. P., concurs in another opinion; SANDLER, J., dissents in a separate opinion.

Report of Referee dated August 25, 1980 confirmed insofar as it concluded that the determination of the respondent was not arbitrary or capricious, and the determination of the respondent dated September 21, 1977 denying petitioner's application for exemption from real property taxes confirmed, without costs and without disbursements.

## APPENDIX

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| In the Matter of | INDEX NO. 13693/77 |
| HOLY SPIRIT ASSOCIATION FOR THE UNIFICATION OF WORLD CHRISTIANITY, | |
| Petitioner, | |
| —against— | |
| THE TAX COMMISSION OF THE CITY OF NEW YORK, | |
| Respondent. | |

TO THE APPELLATE DIVISION OF THE SUPREME
COURT, FIRST JUDICIAL DEPARTMENT:

By an order of the Appellate Division of the Supreme
Court, First Judicial Department, dated April 18, 1978,
this matter was remanded to the office of the Special Ref-
erees and thereafter assigned to me for a hearing together
with my report.

A hearing was held and the transcribed minutes thereof
together with the briefs submitted by the parties are for-
warded herewith. During the course of the hearing, I con-
ducted an *in camera* examination of material in possession
of the United States Internal Revenue Service. The pro-
cedures for such disclosure were adopted to meet the re-
quirements necessary to obtain the consent of that Federal
agency. Disclosure was held at the offices of the Internal
Revenue Service and the disclosure was conducted in this
manner to prevent any possible abuse that might be caused
petitioner by disclosure of incompetent, irrelevant and im-
material documents and papers.

A transcript of those proceedings are clearly marked and
bound separately in a red binding. I have enclosed this
transcript in a sealed envelope to preserve the secrecy under
which disclosure was had. None of the disclosure proceeding
was considered by me as evidence unless the items were
introduced and so marked during the course of the hearing.
While I believe that the *in camera* examination has sanitized
the record so that no abuse could occur, I recommend that
this portion of the transcript be continued under seal so
that the spirit under which petitioner consented to such
disclosure may be maintained.

I report that the preponderance of credible evidence ad-
duced at the hearing established that the respondent's de-
termination was not arbitrary or capricious.

The respondent found that the "Church is so inextricably
interwoven with political motives and activities" to warrant
denial of the tax exemption. That determination is sup-
ported by substantial evidence and there is a rational basis
for respondent to have made that finding.

One of the instructions given to me was to report on
petitioner's primary purpose and I report that petitioner's
primary purpose is religious.

The touchstone for petitioner's faith is the words of Reverend Sun Myung Moon that are believed to be divinely inspired. Those words have been transcribed, translated and digested into a book called Divine Principle, an exhibit. Each member joining the petitioner acknowledges in writing a belief in the Divine Principle and such acknowledgement is the criteria upon which membership as a communicant is determined.

While it does not appear that petitioner devotes much energy to the helping of the poor, unfortunate and otherwise afflicted as other churches, it is evangelical in nature directing its efforts at proselytizing young people. While much of its energy appears to be directed at fund raising, political activities and recruiting members, the thread that binds the members is the belief in the Divine Principle. There is no question that the Divine Principle deals with the relationship of man with supernatural forces in the quest of an ideal life. As such, it is religious in nature and nothing contained in this report should be considered as constituting a comment upon the sincerety or lack of sincerety with which any members of petitioner practices his faith.

In making this report, I am guided by the court's instruction that: "On the other hand, the respondent is not required by Section 421 of the Real Property Tax Law to exempt an organization whose activities are not generically anything but religious merely because the taxpayer says those doctrines are among its theological doctrines."

I report that the petitioner's theological doctrines bind petitioner to a course of political activism and for that reason it is necessary to describe some of those doctrines.

While the religious doctrines of the petitioner, as expressed in the Divine Principle, are grounded upon biblical events and personalities, it is the nonbiblical views that are material to the issues raised in this special proceeding.

The petitioner believes that the physical world consisting of science and economics as well as the spiritual world consisting of religion have developed in accordance with "God's providence" and that "religion and economy relate to social life through politics." (Divine Principle, p 433.)

The petitioner assigns religious significance to events such as World War I and World War II and assigns to the

nations involved in those conflicts religious roles as serving the forces of Heaven and Satan. (Divine Principle, p 475 *et seq.)*

Political leaders of those countries are also viewed as religious protagonists with the example of Hitler's life and death being a mirror image of that of Jesus. (Divine Principle, p 488.)

It is the petitioner's religious tenet that the republican form of government with separate or coequal powers held by the legislative, judicial and executive branches of government is a Satanic principle and that these three governmental branches under the present political system must be brought under a single controlling force as a condition for the second coming of the Messiah (Divine Principle, p 468 *et seq.)*

The Divine Principle espouses a belief that communism is Satan's doctrine and Communist countries are Satan's forces on earth. It further holds that the forces of Heaven are in direct confrontation with the Satanic forces at the present time and they are separated by the 38th parallel presently dividing North Korea from South Korea. (Divine Principle, p 523.)

According to the Divine Principle, the forces of Satan must be subdued and Korea unified under the type of political environment where religions and science are unified in order to make the world ready for the second coming of the Messiah. (Divine Principle, p 530, and § III, beginning at p 516.)

It also appears that petitioner is opposed to the constitutionally mandated separation of church and State.

The foregoing are a sample of religious tenets which, by nature, are political views.

The political views should also be considered in the light of the structure of the petitioner. The petitioner has two types of members. One class called "core members" are a cadre of persons who devote their full time to the petitioner and the petitioner provides for all of the day-to-day needs of these members. In effect, these members receive complete financial support from their full-time services devoted to petitioner.

The second type of member, the ordinary member, may work for one of the corporations or businesses owned directly or indirectly by petitioner. The manner in which a member is classified as a core member appears to be made by a subjective evaluation exercised in some vague manner by petitioner.

Similarly, during the tax years in question, the persons selected to manage and control petitioner were appointed by some fuzzy process that was never explained by petitioner.

The signal importance of petitioner's structure is that it can deploy substantial manpower to further any activity undertaken by petitioner.

The preponderance of credible evidence adduced at the hearing established that petitioner mobilized its cadre to stage a mass demonstration in Washington, D.C. as evidence of support for then President Nixon at the time the House of Representatives was to take up the issue of his impeachment. The petitioner maintained that this activity was religious in nature. It is my view that the question of impeaching a President is a political issue. The vote of the House of Representatives has political aspects because any of the political factors relating to the passage of legislation may be the deciding factor for the vote. These political factors may include party loyalty as well as the tools used by leaders of the majority and minority in the House of Representatives to marshal votes.

The staging of a demonstration in the Capitol at that time had clear and unmistakable political purpose and was a political activity.

In addition to the rally, the petitioner's director of training formulated a training program to indoctrinate petitioner's leadership with respect to political matters such as the need to establish a particular type of government in the Republic of Korea and the teaching that former President Nixon's actions while President gave him a "providential standing" not overshadowed by the Watergate crisis.

The petitioner maintains an office on Pennsylvania Avenue, Southeast, in Washington, D.C. The petitioner's president testified as follows: "The purpose of the office was to

communicate the Divine Principle and recruit members from among the Capitol Hill Community including Congressmen and their staffs and also to make them aware of moral perspective."

To recruit any person to membership would mean such person would have to accept the teachings in the Divine Principle that the republican form of government with separate and coequal branches is a Satanic concept to be abolished; that there is a need for a third World War to subdue the forces of Satan and that Korea must be unified under a theocratically disposed form of government favorable to petitioner, as well as the elimination of constitutional prohibitions against the establishment of a State religion.

While the above-quoted statement is an admission of political activity on the part of petitioner, I cannot accept this testimony as being truthful or forthright.

Dr. Sontag, petitioner's expert witness, testified in substance that petitioner's proselytizing activities were directed toward young people of college age and that the only older members he observed were early converts who had matured after they became members.

The minimum age of a member of the House of Representatives is 25 (US Const, art I, § 2) and Senators must be at least 30 years old (US Const, art I, § 3). The practical reality of these constitutional requirements is that Senators and Representatives are persons of more mature years than those the petitioner actively seeks as members.

The credibility of this witness with respect to this issue is also jaded by the fact that he admitted to issuing a request to church members during the Watergate period to write letters of support for former President Nixon without revealing that the scrivener was a church member.

As a result, I report that the preponderance of credible evidence adduced at the hearing establishes that the Washington office is being used for political purposes.

There are a number of organizations such as Freedom Leadership Foundation, American Youth for a Just Peace, International Cultural Foundation, Professor's World Peace Crusade, Korean Cultural and Freedom Organiza-

tion, Collegiate Association for the Research of Principles and the Christian Political Union that appear to have petitioner's support. The petitioner's expert witness admitted to a church relationship and the evidence adduced at the hearing established that the petitioner's full-time members who are supported by the church also devote extensive time and energy to these organizations.

I believe that portion of Albert Tate Wood's testimony to the effect that American Youth for a Just Peace was formed to combate the passage of the Cooper-Church and McGovern-Hatfield amendments by Congress and that his services as a founding cochairman were provided by petitioner.

This was clearly a political activity designed to prevent passage of legislation limiting the Viet Nam conflict and the assignment by petitioner of its church supported full-time member constituted a political activity.

Similarly, I believe his testimony that he received a rent-free residence from petitioner while he was serving as president of the Freedom Leadership Foundation, a post subsequently held by petitioner's president.

There were other activities such as the staging of anti-Communist rallies in Washington, D.C. and Tokyo; a protest against the establishment of relations with the People's Republic of China; a protest against foreign government policy directed against Japanese wives of Korean nationals and protest to direct public opinion against Japan by highlighting the fact that a Japanese national, using a Japanese made Sony tape recorder to conceal the weapon, assassinated the wife of the President of Korea.

The last demonstration reflects the political involvement of the petitioner because that demonstration was canceled at the request of a member of the United States National Security Council, a person whom the witness refused to further identify.

The petitioner's involvement in these political activities is not an isolated mobilization in behalf of a political cause. Each activity is consistent with the expression of political motives set forth in the Divine Principle and is part of an

over-all plan and it is petitioner's deployment of its cadre and administrators for these activities that mark its involvement in political causes.

This type of deployment of personnel is evident in the operation of petitioner's business enterprises. Petitioner has direct interest in many corporate businesses with such varied economic activities such as ship owning, seafood purveying and those of a furrier.

The directors and officers of these corporations are persons who are closely identified with petitioner in its religious activities.

For example, Reverend Sun Myung Moon is a director of International Oceanic Enterprises, Inc., International Seafood of Mass., Inc., News World Communications, Inc., One-Up Enterprises, Inc. The petitioner's president, Neil Salonen, is a director of International Oceanic Enterprises, Inc., International Seafood of Mass., Inc., and other corporations.

The president has his offices at 4 West 43rd Street, Manhattan, one of the parcels that is the subject of this special proceeding.

He testified in substance that the Reverend Moon's election as a corporate director was a token expression and that he devotes minimal time to corporate affairs.

Such testimony does not have the ring of truth. One of the principal tenets advanced in Divine Principle is that there be complete integration of all economic, social and religious activities. The operation of these corporations as organically independent entities divorced from petitioner's control would be contrary to petitioner's religious teachings.

The practical effect of this centralized control is demonstrated by the fact that Bruce Brown, a witness, has assumed the presidency of Christiana Bahn, Inc. That corporation is engaged in the fur business. The post that he held prior to becoming president was that of director of legal affairs for petitioner. As such, he devoted his full time to petitioner and the petitioner provided for his support.

The method by which he was selected for the presidential post or the circumstances attending his transfer were never disclosed by petitioner. However, this type of assigning of

full-time members to perform other duties appears to be consistent with petitioner's practice in utilizing the services of its cadre to carry out church-related pursuits in the same manner as the witness, Woods, was assigned to his political duties.

Section 701 of the Business Corporation Law provides that "the business of a corporation shall be managed under the direction of its board of directors" and in the absence of any countervailing proof, I report that the various corporations are so managed.

One of those directors, the petitioner's president, maintains his offices at 4 West 43rd Street. The premises also houses the petitioner's department of financial affairs and department of legal affairs where Bruce Brown worked. It is the petitioner's administrative center and the inescapable inference is that petitioner's president and director of legal affairs used the offices they maintain in the premises to perform some of their corporate duties and the corporate businesses are also intertwined with petitioner's other activities.

With respect to the specific properties, the proof adduced at the hearing established that the premises at 4 West 43rd Street are substantially as described in *Matter of Holy Spirit Assn. for Unification of World Christianity v Tax Comm. of City of N.Y.* (62 AD2d 188, at p 191) with the exception that the tenancies of the commercial tenants have been terminated and are now occupied by petitioner.

The respondent conducted a physical inspection of the premises during the pendency of the hearing and a floor plan of the premises was supplied by petitioner for use in conjunction with that inspection.

There is no dispute that the floor plans accurately reflect the description of the premises as they existed on March 8, 1979 and I so report.

I also report that the building's primary purpose is to serve as a center for the petitioner's activities, religious as well as those described in this report.

With respect to the premises 305 West 107th Street, petitioner furnished a floor plan for the structure and there appears to be no dispute that this exhibit accurately de-

scribes the premises and the occupants thereof and I so report.

I also report that the proponderance of credible evidence adduced at the hearing established that the missionary activities are the primary purpose.

The petitioner contended that the premises are open to the public and are used as a public house of worship. No persuasive proof to support such claim was adduced at the hearing.

The evidence established that the building houses a team of persons who devote their efforts to proselytizing students attending Columbia University. The house is visited by the prospective members and they dine with the residents and meet with them.

The portions of the premises used to conduct religious services are utilized by the residents and prospective members. The fact that there is a small sign in a window is not sufficient to establish that the public attends the premises as a house of worship.

The proof at the hearing establishes that the premises are as described at page 191 except for the number of students and nonstudents residing there from time to time varies.

The nonstudent members in addition to performing administrative, maintenance and housekeeping functions also raise funds to sustain the structure and its residents.

The unit is operated as a self-sufficient entity, and funds are obtained by the residents through seeking of alms from the public as well as from street peddling of nonreligious articles.

The nonstudents perform the fund raising activities and students from time to time are also called upon to perform the same duties. The fund raising activities appear to be substantial and they also include raising money for the petitioner through the same devices.

Notwithstanding the other activities, the dominant and primary purpose for this building is missionary in nature.

With respect to the Queens property, there appears to be no substantial dispute as to the layout of the premises or the purposes for which it is being used.

After June 30, 1977, the vacant portions of the building

were leased to commercial tenants and no tax exemption is being sought after that period.

The petitioner maintains that the building was purchased with the original intent of using it for church purposes and petitioner was compelled to abandon the purpose when it was discovered that the printing machines necessary for the purpose were so heavy that the floor could not withstand the stress of the weight.

The only proof of such intent was the oral testimony of petitioner's witnesses as to the state of mind that existed at the time of purchase.

The building is a structure of substantial size and represents a significant capital asset with the attendant cost of purchase and maintenance. There is every practical reality that a transaction of this magnitude would include extrinsic evidence of petitioner's intent such as feasibility studies, engineering reports, representations made in the contract of sale, as well as proof as to the petitioner's efforts to carry out its alleged intent and the circumstances under which it was discovered that the alleged intent could not be realized.

No such proof was adduced at the hearing. I report that the ultimate use found for the vacant premises is the most persuasive evidence as to petitioner's state of mind at the time of purchase and that the primary purpose for this property is the taxable use to which it was put.

In summary, I report that the petitioner has the burden of proof as to establising the right to the tax exemption and it failed to sustain that burden at the hearing. The evidence at the hearing established that petitioner's religious purposes are intertwined with political and economic objectives that form an amalgam that is served by a cadre of full-time church-supported administrators and workers that are shifted at will by some undefined directive force from religious to other purposes. Under such circumstances, there is a rational basis for respondent's determination and substantial evidence to support that determination.

Respectfully submitted,
DONALD DIAMOND

DATED: August 25, 1980