**Anthony COLOMBRITO, Plaintiff,**

v.

**Galen G. KELLY, et al., Defendants.**

**No. 79 Civ. 6205 (RO).**

United States District Court,
S.D. New York.

July 5, 1984.

As Amended July 20, 1984.

Levy, Gutman, Goldberg & Kaplan, New York City, Noel Tepper, Poughkeepsie, N.Y., for plaintiff; Jeremiah S. Gutman, New York City, Stephen M. Lipton, Poughkeepsie, N.Y., of counsel.

DeGraff, Fox, Conway, Holt-Harris & Mealey, Albany, N.Y., for defendants; John T. DeGraff, Jr., Robert H. Iseman, Albany, N.Y., of counsel.

## OPINION AND ORDER

OWEN, District Judge.

Before me is a motion by defendant Galen Kelly for attorney's fees incurred in defending against a $9,000,000 civil rights action which the plaintiff sought to drop before the conclusion of but after some three weeks of trial. Plaintiff's application to discontinue the action was denied by this Court under circumstances that are detailed hereafter. On mandamus to the Court of Appeals with a stay of the trial, the action was terminated with prejudice pursuant to Fed.R.Civ.P. 41(a)(2) as if judgment had been rendered in defendant's favor after completion of trial, and with the commitment of a non-party, the Holy Spirit Association for the Unification of World Christianity, to pay any attorney's fees that might be awarded.

Plaintiff Anthony Colombrito is a young man who was—and still is—a member of the said Holy Spirit Association, the major United States organization of Reverend Sun Myung Moon. Defendant Galen Kelly for many years has been engaged by the parents of various young men and women, members in certain cults or sects, to assist in getting their son or daughter to leave the sect. This endeavor has come to be called "deprogramming".[1] In this case, Kelly had been engaged by Anthony Colombrito's parents to "deprogram" their son from the Holy Spirit Association. The parents were motivated by the fact that their son, a college graduate, was spending almost every day of the year from 8:00 a.m. to 11:00 p.m. as a member of a fundraising team selling flowers on the streets to raise money for the Association, which regime they believed to be jeopardizing his mental and physical health.[2] His mother, anguished over this, went to a New Jersey state court and obtained a court order giving the parents temporary custody of Anthony. Her sworn petition in support of the application described her son's activities as follows:

> ... Part-time work on Master's Degree, never completed. Repaying school loan. Suddenly stopped payments. Loan still partially outstanding.
>
> ... Every two or three months, Anthony calls. He only says what he is doing, not interested in coming home. Paranoid

---

1. Defendant Kelly explained his view of "deprogramming" as follows:

   ... the person has had an opportunity to in a neutral atmosphere receive certain types of information, presented in a variety of ways, either his own reading or by myself or a variety of experts from different professional communities ... After going through this process of being in this neutral environment, having the information and access to professional people and then having the ability, in his own time and manner, to make his own decision as to what to do with the rest of his life—

2. The team soliciting finished as late as 4:00 a.m. on weekends because the bars were open.

about coming home, no interest, no thought of coming home.

\*     \*     \*     \*     \*     \*

Efforts to visit—allowed only when supervisors say so. He only wanted to sleep during visit, had to work all previous night to make up for visit time. Anthony could not tie shoes, could not make decision, could not distinguish knife and fork, is afraid to take shower, would not talk, seemed in a trance.[3]

The court order was granted—and its validity was not successfully challenged during the later trial before me. Thereafter, the parents had a "social" meal with Anthony at a Howard Johnson's in Kingston, New York. Afterwards they got into their car in which, by prearrangement, Kelly and an associate were already seated in the back, and drove the unwilling Anthony to Kelly's grandmother's home nearby to start "deprogramming" rather than taking Anthony back to his residence at the Holy Spirit Association.[4]

In this case however, the "deprogramming" did not run its course since certain Association members located Colombrito

the next day and, after a series of events causing police intervention, Colombrito returned to the Association amid charges and countercharges of kidnapping and assault, all of which failed of grand jury action. This federal civil rights action, with Colombrito as the sole plaintiff against Kelly and others—but significantly not his parents—followed.

During the course of the extensive trial I heard much uncontradicted testimony as to other young men and women being induced by an escalating and eventually heavy indoctrination to become followers of Reverend Moon. These followers were then placed in teams and sent out in vans to various sites throughout the United States to sell flowers and solicit money on the same approximate schedule as had Anthony.[5] At the trial, Kelly flew deprogrammed young men and certain of their parents to New York from all over the country to testify to this, and to the fact that they had been questionably fed and housed. I heard little contradiction of the foregoing by anyone affiliated with the Holy Spirit Association. I also heard un-

---

3. On the trial, when questioned as to this, Anthony, in some guarded and curious answers, stated:

> THE COURT: ... if you play around with the probabilities we are dealing with here, if you were not doing these things, then your mother wouldn't have the causes for concern. If you were doing these things, she would have the causes for concern and one is puzzled about a mother committing perjury in a court pleading if the things didn't in fact happen.
>
> So you start off with that foundation and then one says to you, "Well, your mother who you say loves you," and one presumes does, and these Christmas cards indicate that they are still trying to keep a door open, and you say you saw them three weeks ago, but she is concerned enough to make statements under oath, she is concerned enough to pay $5,000 in expenses from money that is after-tax dollars, and can be ill afforded, and she comes in and says these things...
>
> You are telling me these things are not true and she is not telling the truth?
>
> MR. COLOMBRITO: I believe she is telling the truth. What she observed, your Honor, I am not sure of. That is what I was referring to. The appearance and the reality I am not sure of.

> THE COURT: What is the slip between reality and appearance that you say you are not sure about? Where is the divergence between appearance and reality?
>
> MR. COLOMBRITO: Interpretation.

4. This sort of subterfuge was used because Colombrito's parents were informed that the Holy Spirit Association had a policy of protecting or secreting members whose parents sought to encourage them to leave the Association. On the trial, an expert witness in psychiatry proffered by Colombrito, Dr. Lee Coleman testified:

> You are asking about the mental state of the member of a new religious group and included in the mental state is the concern that this might be a trick to grab them, because it has happened many other times...
>
> I can tell you that the defensiveness and the wish to protect their privacy of church members, from what I have seen, is based primarily on the activities of families and people they have hired, which have included forcible abductions, forcible admissions to mental hospitals—

5. A good fund raiser can bring in several hundred thousand dollars a year, while even a poor one brings in $25,000 to $50,000.

contradicted evidence of callousness by members of the Association in thwarting parents' efforts to meet with their children when it was believed a parent wanted to talk to the child about leaving.[6]

The evidence regarding Anthony and other similarly situated Association members presented a picture of an organization raising substantial funds at great personal cost to its members. The great bulk of these funds were expended on such things as an annual multi-million dollar international conference and the lavish personal expenses of Reverend Moon and certain high officials of his various organizations, with but modest expenditure on works more traditionally regarded as that of a religious group. As plaintiff's claims involved allegations that defendant Kelly abducted him with a "class-based animus" of hostility to his religion, I concluded that, in light of evidence such as that referred to above, Kelly was justified in raising the question of whether or not the Holy Spirit Association was a bona fide religion.

As was stated on the trial:

THE COURT: What do you want to call [Reverend Moon as a witness] for?

MR. DeGRAFF: Well, I think ... they have to prove it is a bona fide religion. [Plaintiff Colombrito] has testified that the Reverend Moon is his personal Messiah and I think I have indicated it is my belief that the Unification Church is a fraud.

I would like to question the Reverend Moon on some of the practices of his church, some of his beliefs.... Are they legitimate or are they a horrendous hoax on the people [taking] advantage of our constitutional rights for freedom of religious beliefs ... to raise terrific funds of money which have been cited at $21 million a year out of the New York City area alone, used for multitudinous purposes which have nothing to do with religion...

It was on this issue—the Association's claimed status as a religion—that I upheld the propriety of service of a subpoena on Reverend Moon to testify as a witness upon the trial.[7] That ruling was immediately sustained by the Court of Appeals on a writ of mandamus. Inquiry into this area is clearly appropriate in such circumstances. While a religious belief once established to be genuinely held may not be questioned, inquiry into whether it is a genuinely held belief is a different matter. *Holy Spirit Ass'n v. Tax Com'n*, 55 N.Y.2d 512, 519, 528, 450 N.Y.S.2d 292, 435 N.E.2d 662 (1982).

Thereafter, on the morning of Reverend Moon's scheduled appearance on the witness stand on May 26, 1982, Colombrito's attorney announced that Colombrito was moving to discontinue the action with prejudice pursuant to Rule 41. Kelly's counsel opposed this, desiring a judicial resolution of the legal issues raised in this bitter, extensive and expensive trial involving Kelly's conduct as a deprogrammer. They stated:

MR. DeGRAFF: I think in all humility we probably have the best record we are ever going to get in a case of a deprogrammer here and we spent a lot of time and effort here and we want to go through with it.

Mr. Gutman keeps saying you have to believe everything people say and you can't look into anything, but we have looked into it and we have good proof and I don't see how they have the right

---

**6.** In this vein, I heard testimony as to a mother who had traveled across the United States to visit her son. They were being driven around at night by two other Association members. The driver, tiring of hearing her efforts to talk her son into leaving the Association, forced her to get out of the car in a remote area of Oakland, California, she not knowing where she was, whereupon the car drove off. Her son, then in the Association's sway, was secretly flown to Oregon the next day to prevent further such approaches.

**7.** I note, and was aware then that this was hardly the first time this issue had been seriously raised either by private citizens or governmental agencies. See, *e.g. Holy Spirit Ass'n v. Tax Com'n*, 81 A.D.2d 64, 438 N.Y.S.2d 521 (App.Div., 1st Dept., 1981), rev'd, 55 N.Y.2d 512, 519, 450 N.Y.S.2d 292, 435 N.E.2d 662.

at this point to say, "The ballgame is over. We are going home."

MR. ISEMAN: Your Honor, I think it is of very little comfort to Mr. Kelly to listen to Mr. Gutman's assurance that his offer is to discontinue the matter with prejudice, having gone through the Vogel matter, which also involved millions of dollars, under virtually an identical complaint and he knowing full well if this matter is dismissed with prejudice there would be no precedent to prevent the Unification Church from fomenting still another lawsuit and another under the same complaint with simply a change in names, to continue this pattern of harassment.

In this case, in view of the conduct of the Unification Church, I submit the offer of "with prejudice" has a very hollow ring to it and gives Mr. Kelly no assurance or comfort at all.

It having been established in prior testimony that Colombrito was not financing his own action but that the Holy Spirit Association was financing it, and that Reverend Moon's attorneys had furnished Colombrito's attorneys with the materials from which to argue in opposition to the issuance of the subpoena to Reverend Moon, I made inquiry under oath of Colombrito and his lawyers as to the circumstances under which the decision was made to drop the case. Colombrito informed me that he had decided to drop the case the prior *afternoon* and that he was doing so to spare his religious leader from taking the witness stand. However one of Colombrito's lawyers stated that he had been informed by Moon's lawyers at the beginning of the prior *morning* that Colombrito was dropping the case.

Rule 41, under which the application was made, provides that it is the *plaintiff* who may drop the case, and that the court may allow it under such terms as are just. It appeared here that it was not the plaintiff's decision to drop the case but that of Reverend Moon or others connected with him, and that the plaintiff was in no position to respond at all to the expense to which Kelly and his co-defendants had been put in their defense. Being further informed that Kelly had been named a defendant in an earlier almost identical action brought by another Moon follower, Ellen Vogel, which had also been dropped by the plaintiff during the course of discovery, it was clear that the Holy Spirit Association, with its great wealth, had Kelly at an obvious financial disadvantage and was using this litigation for economic harassment. Consequently it was troublesome to the Court to be met with a shrug of the shoulders when I inquired of Colombrito's attorneys as to who would recompense Kelly for his expenses in the event the case was to be dropped.

Given the foregoing, I declined to grant the motion because it was, in reality, the Association's motion and because no terms could be imposed under Rule 41 which would be "just" to the defendant. The trial therefore went forward and Reverend Moon commenced what was to be two days of testimony on issues material to the litigation. At that point the Court of Appeals on further mandamus reversed this Court's denial of the motion to discontinue the action and ordered the action terminated, *conditioned, however,* upon a commitment by the Holy Spirit Association—not a party the action—to pay whatever attorney's fees and costs were determined to be appropriate on remand to this Court. That commitment was immediately made by the Association.

Turning to an award of fees, I find from all the evidence that the Holy Spirit Association was using this action to harass Kelly. This is demonstrated by the fact that it was financing and controlling this—the Colombrito case—hard on the heels of the Vogel case against Kelly, which was also dropped. From Church of Scientology internal documents, which were obtained by the F.B.I. and were before me on this motion, it also appears that there was an "organized movement against Kelly by cultists," to drive him from the deprogramming scene. One of Colombrito's lawyers on this trial, who was earlier a lawyer for the Hari Krishnas, is prominently men-

tioned in those documents as a member of this "organized movement" with the intention to "get [Galen Kelly] and all others involved."

My conclusion that this action has been brought vexatiously is further supported by the fact that one of the causes of action under § 1983 (which was dismissed at the close of the plaintiff's case) had, *and plaintiff must have known it had,* no merit at all. This was the cause of action alleging a conspiracy with the Judge who issued the order giving the parents temporary custody of Anthony. Plaintiff never had any evidence, even after discovery, showing any conspiracy between Colombrito's parents and the Judge which was necessary to meet the "state action" requirement under § 1983. *Rankin v. Howard,* 633 F.2d 844 (9th Cir.1980).

Finally, as was demonstrated on the trial by Colombrito's own testimony, Anthony believed that his parents were acting in good faith on his behalf, that his mother was not lying about her observations of his physical and mental condition in her affidavit to the State Court judge, and that Kelly was only acting to carry out his parents' wishes based upon their concern for him. Given all of this, and the fact that Kelly was named as a defendant but not Colombrito's parents, I have no hesitation in concluding that this action was instituted by the Holy Spirit Association for the Unification of the World Christianity for the purpose of harassing Kelly and not because Colombrito genuinely believed that his par-

ents and Kelly had conspired with the intent to deprive him of his civil rights.[8]

I conclude that an award of attorney's fees incurred in defending against this vexatious, meritless action is entirely appropriate. 42 U.S.C. § 1988. See *Christiansburg Garment Co. v. E.E.O.C.,* 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978).[9] Defendant Kelly was represented on this trial by two extremely fine lawyers, Messrs. John T. DeGraff, Jr. and Robert Iseman from the firm of DeGraff, Foy, Conway, Holt-Harris & Mealey of Albany, N.Y. Their time sheets on this motion are not in dispute and are in accord with what I observed as the trial judge. Further, from my observation of the complexity of the issues and the sweeping fluidity of the trial it is abundantly clear that two attorneys for the plaintiff were fully justified. I note in this connection that Colombrito himself had two attorneys throughout most of the trial. Under the circumstances, given the time spent and the quality of the representation, attorney's fees in the sum of $75,000 for three weeks of trial and trial preparation is more than justified. Also under the various rubrics set forth earlier, I award as costs the sum of $3521.05 for depositions and transcripts, witnesses, travel and interpreters' fees. Also awarded are $5,546.76 pretrial and trial disbursements consisting in the main of transportation to New York and living expenses of counsel made necessary by the institution of this harassing action. I decline the

---

**8.** The lack of any basis for a claim of intentional infringement of plaintiff's rights or acts motivated by a class-based animus was dramatically demonstrated in Anthony Colombrito's own testimony:

> Q. So it was your parents acting out of their love for you, whom they had cared for for twenty-five years, who hired Galen Kelly to do what they thought was best for you?
> A. That is correct.
> Q. And that they were acting in good faith when they did that?
> A. I am assuming so, yes.
>     *    *    *    *    *    *
> Q. Galen Kelly was carrying out the wishes of your parents when he tried to deprogram you, was he not?
> A. Yes.

> Q. And it was your parents' wishes based on their concern for you, their son, to try and have you deprogrammed?
> A. Yes.
> Q. And they were acting with good motivation as far as they were concerned in doing that?
> A. I think as far as they were concerned, that is right.

**9.** While the instant motion was presented in terms of an award pursuant to § 1988, I observe that attorney's fees could also be assessed pursuant to Rule 41 or the common law rule on bad faith litigation. *Browning Debenture Holders' Committee v. DASA Corp.,* 560 F.2d 1078, 1987–9 (2d Cir.1977).

award of a lodestar increment in this situation.

The foregoing total award of $84,067.81 is hereby made and is imposed jointly and severally against plaintiff and The Holy Spirit Association for the Unification of the World Christianity pursuant to its commitment, together with 9% interest[10] commencing May 28, 1982, the date of order of the Court of Appeals directing the termination of the action.

Submit judgment accordingly.

10. The Court of Appeals directed that this action be dismissed as though "judgment had been rendered in defendants' favor after completion of trial" so I regard the stipulation and order entered after that court's ruling as the equivalent of a final judgment for these purposes. Interest on awards of attorney's fees is appropriate in such circumstances. See, Gates v. Collier, 616 F.2d 1268 (5th Cir.1980).