764 F.2d 122
 2 Fed.R.Serv.3d 883
 Anthony COLOMBRITO, Plaintiff-Appellant,
and
The Holy Spirit Association for the Unification of World
Christianity, Appellant,
v.
Galen G. KELLY, Galen Kelly Assoc., Lew Fedyniak, Thomas
Orosz and John Doe, Defendants-Appellees.
 No. 619, Docket 84-7672.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 4, 1985.
Decided June 12, 1985.
 
 Laurence H. Tribe, Cambridge, Mass. (Eric M. Lieberman, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., Jeremiah S. Gutman, Levy, Gutman, Goldberg & Kaplan, New York City, of counsel), for appellant.
 Robert H. Iseman, Albany, N.Y. (John T. DeGraff, Jr., DeGraff, Foy, Conway, Holt-Harris & Mealey, Albany, N.Y., of counsel), for defendants-appellees.
 Before MANSFIELD and PIERCE, Circuit Judges, and BARTELS, District Judge.*
 MANSFIELD, Circuit Judge:
 
 
 1
 The Holy Spirit Association for the Unification of World Christianity ("HSA" or the "Unification Church"), a controversial organization, appeals a judgment of the Southern District of New York, Richard Owen, Judge, 590 F.Supp. 181, ordering it to pay $84,067.81 in attorney's fees and costs, plus interest, to the defendants after the voluntary discontinuance with prejudice of a suit by Unification Church member Anthony Colombrito against Galen Kelly, an individual whose occupation is to "deprogram" youths who join HSA or similar organizations. We reverse.
 
 
 2
 "Deprogramming," as characterized by Kelly, is a process designed to provide a church or cult member with an opportunity in a neutral setting to sleep, to eat, to evaluate the manner in which he wishes to live his life and then, well-rested and well-fed, to make an independent decision about whether to remain involved in the group. HSA, on the other hand, characterizes "deprogramming" as a process involving kidnapping and forcing an individual to renounce his religious beliefs.[1] Kelly conceded in his trial testimony that "deprogramming" sometimes was carried out by holding persons in custody against their will, and that at the time of the events in this case he had "deprogrammed" approximately 100 to 130 people, perhaps 50% of whom were members of the Unification Church.
 
 
 3
 This case arises out of a 1979 effort by the parents of Anthony Colombrito to forcibly remove their 27-year-old son from the influence of the Unification Church. In March 1977 Anthony voluntarily joined the Church. In 1978 his parents became concerned about his health and well-being. He had dropped out of graduate school, quit his job, ceased or reduced his loan payments, lost interest in returning to his parents' home in New Jersey or in even visiting it, and spent 15 hours or more a day working on a fundraising team for the Church, selling flowers on the street. When the Colombritos visited Anthony at the Church seminary in Barrington, Dutchess County, New York, where he was living, his mother believed that he looked exhausted and confused, having stayed up working the previous night to make up for the time set aside for the visit. She described him as unable to tie his shoes, to make decisions, and even to distinguish between a knife and a fork.
 
 
 4
 Worried about her son, Mrs. Colombrito in September 1978 communicated with Galen Kelly, a private investigator who had made a career out of providing parents with services and methods designed to induce their children to leave the Unification Church and other sects. At Kelly's suggestion, Mrs. Colombrito through an attorney applied ex parte in June 1979 to a New Jersey state court for an order of guardianship that would give her temporary custody of Anthony. Although New Jersey law requires such petitions to be accompanied by affidavits from two physicians, see N.J.R.Civ.Prac. 4:74-7(b), Mrs. Colombrito provided only one affidavit, from a doctor whose son had joined the Church and had later been deprogrammed. The complaint stated that Anthony was last domiciled in New Jersey but was residing in Atlanta, Georgia, beyond the court's jurisdiction. The complaint also stated that there was an immediate danger of Anthony's being "taken from or induced to leave the jurisdiction of the court" even though he was not within the court's jurisdiction. In another filing, Mrs. Colombrito describes her son as "domiciled at various addresses not of his own choosing." By the time of the deprogramming, Anthony was in New York, also outside of the New Jersey court's jurisdiction.
 
 
 5
 Although Kelly's letter to Mrs. Colombrito named a New Jersey judge who had been "very cooperative in signing [such] orders," that judge did not hear the case. Instead, in mid-June 1979 New Jersey Superior Court Judge Henry H. Wiley, to whom the case was submitted ex parte, ordered a hearing in September on Anthony's alleged incapacity and simultaneously appointed a guardian ad litem and granted Mrs. Colombrito custody of Anthony for 45 days. Temporary custody was later extended through mid-October (after which the matter was dismissed by stipulation).
 
 
 6
 Following the New Jersey court's issuance of the orders, the Colombritos visited Anthony in August 1979 at the HSA seminary in Barrington, New York. They induced him to join them for a ride in their automobile to Kingston, N.Y., for dinner. Anthony testified that while he was seated in the back seat of his parents' car in a parking lot, with his father in the front seat, Kelly and a colleague (Eric Shufelt), came up to the car, opened the rear door, entered the car, locked the doors, and kept him in the middle between them so that he could not escape. With the three (Kelly, Anthony and Shufelt) in the back seat Anthony's father, as prearranged with Kelly, drove the car, followed by another automobile with which Kelly was in radio communication, to a trailer located on isolated farm land in Accord, N.Y., owned by Kelly's grandmother. Kelly, who at times was armed with a pistol, and his colleagues then kept Anthony overnight against his will in the trailer, stated that under the court order they could keep custody of him for 30 days, and made efforts to "deprogram" him. Guards were posted at Anthony's door and he reasonably believed that if he tried to leave he would be physically prevented from doing so.
 
 
 7
 The abduction was interrupted the following day by police who had been called by the Unification Church. The police found Anthony tired but rational, clear and normal in his conduct and responses. He stated that he was being held against his will and wanted to return to the Church. He then returned to the Church seminary. At no time during these events was he in the State of New Jersey.
 
 
 8
 That fall, Colombrito brought the present suit in the Southern District of New York against Kelly and Kelly's firm and associates. The complaint alleged that the defendants had (1) conspired, motivated by animus against his religion, to deprive him of his civil rights in violation of 42 U.S.C. Sec. 1985(3),[2] (2) deprived him of his constitutional rights under color of state law, in violation of 42 U.S.C. Sec. 1983, and (3) discriminated against him in violation of New York State Civil Rights Law. It sought a permanent injunction against Kelly, compensatory and punitive damages, and attorneys' fees under 42 U.S.C. Sec. 1988.
 
 
 9
 After approximately two years of discovery, trial was commenced before Judge Owen, sitting without a jury. Anthony Colombrito testified about his membership in the Unification Church, the nature of his religious beliefs, the abduction, and Kelly's attempt to deprogram him. The record reveals Anthony's answers throughout his examination and extensive cross-examination to be clear, rational and responsive. On cross-examination he acknowledged that he believed that his parents had acted out of love and concern for him, however misguided, and that he had acted pursuant to their wishes in going with them to Kingston, where he was kidnapped. Plaintiff called defendant Kelly as a hostile witness, and Kelly described his work, including the attempted "deprogramming" of Colombrito. There was also testimony from a police officer about the kidnapping report received by the police department and about the department's response. In addition, plaintiff introduced extracts of depositions of the attorney who had obtained the guardianship order in New Jersey and of the guardian ad litem appointed by the New Jersey court.
 
 
 10
 At the close of plaintiff's case, the defendants moved for a directed verdict on all claims. Judge Owen dismissed the Sec. 1983 claim on the ground that Colombrito had not shown the requisite state action, concluding that there was no evidence that the defendants had conspired with the New Jersey state judge who issued the guardianship order. At most, the state judge had neglected to determine whether the requested guardianship order was within the statutory authorization. Judge Owen reserved decision on Colombrito's Sec. 1985(3) and state law claims.
 
 
 11
 The defense then sought to establish that the Church was not a bona fide religion protected by Sec. 1985(3) and that Kelly had acted not out of animus towards Colombrito's religion but out of Mrs. Colombrito's concern for her son's well-being. Several former Church members who had been deprogrammed by Kelly testified that the Church deceptively recruited young adults, "brainwashed" the recruits, deprived them of free choice, and exploited them in continuous fundraising efforts to the detriment of their health. Religious and medical professionals and parents of former Church members gave similar testimony. In particular, an experienced psychiatrist gave his medical opinion that HSA members were under church-imposed mind control.
 
 
 12
 In rebuttal plaintiff called as witnesses a series of professionals possessed of advanced education, graduate degrees and/or experience in practice or teaching in the fields of religion, physics, adult psychology, theology, and psychiatry, some of whom were members of the Unification Church. In general they testified favorably with respect to the religious views and activities of the Church. One expert (Coleman), an experienced psychiatrist, testified to the various meanings of the term "brainwashing" and gave his opinion that mind control was not being exercised by the Church.
 
 
 13
 During trial the defense had expressed its desire to subpoena Reverend Moon, the leader of HSA and Colombrito's purported Messiah, in order to determine whether HSA was a bona fide religion or a calculated sham. Judge Owen issued a subpoena for Moon, which, for procedural reasons, this Circuit refused to quash. On discovering that Moon would be required to testify, Colombrito notified Judge Owen that he wished to dismiss his suit against Kelly with prejudice under Rule 41(a)(2). Fearing that Colombrito was not expressing his own views but rather those of the Church, which was paying the litigation expenses and which had been involved in the decision to initiate the suit, Judge Owen held a hearing inquiring into plaintiff's decision to drop the suit. Because of inconsistencies between the testimony of Colombrito and his attorneys that seemed to the judge to indicate that a decision to discontinue the suit had been reached before the time of decision testified to by plaintiff, the judge denied the motion to discontinue the action. The defense then called Reverend Moon to the stand and began questioning him about the religious basis of the Church.
 
 
 14
 After two days of testimony by the witness, plaintiff obtained a writ of prohibition from this Court, which directed Judge Owen to grant Colombrito's motion to dismiss the case with prejudice under Rule 41(a)(2) and to seal the Moon testimony. That order, filed May 28, 1982, stated that the district court's dismissal was to be "without prejudice to any application which may thereafter be made under 42 U.S.C. Sec. 1988 or other applicable statutes or rules of procedure as if judgment had been rendered in defendants' favor after completion of trial." In re: Holy Spirit Association, No. 82-3035, Mem. at 2 (2d Cir. May 28, 1982). The order further prohibited the district court, "in any proceedings in the District Court under 42 U.S.C. Sec. 1988 or otherwise," from taking any evidence or holding any proceedings that "have the effect of circumventing or frustrating the purpose of this writ." Id. As a precondition to dismissal, our order required the Church to stipulate that it "shall not commence any action against the defendants in this case for any of the transactions alleged in plaintiff's complaint in this case and shall pay any costs or attorneys' fees awarded to defendants under the Order to which this Stipulation is annexed."
 
 
 15
 A representative of the Church signed the stipulation and Judge Owen dismissed Colombrito's suit with prejudice. Thereupon, the defense moved for attorney's fees under 42 U.S.C. Sec. 1988 and for costs under 28 U.S.C. Sec. 1920. Judge Owen held the motion for two years and in July 1984, without any hearing and without any explanation for the long delay, awarded fees and expenses to defendants in the sum of $84,067.81, plus interest at 9% from May 1982. See 590 F.Supp. at 187. In making the award, Judge Owen relied on:
 
 
 16
 (1) the fact that a prior suit against Kelly by a church member regarding a deprogramming had been dropped before resolution on the merits;
 
 
 17
 (2) documentary evidence submitted by Kelly that consisted of records confiscated by the FBI from the Church of Scientology describing efforts by cults to discredit Kelly and indicating involvement by one of Colombrito's attorneys in an organized effort to drive Kelly out of the deprogramming business;
 
 
 18
 (3) the fact that the Sec. 1983 cause of action "had, and plaintiff must have known it had, no merit at all," id. at 186 (emphasis in original); and
 
 
 19
 (4) the meritlessness of the Sec. 1985(3) claim in view of Colombrito's admission that his parents believed they were acting in his best interest and his acknowledgment that Kelly was carrying out their wishes.
 
 
 20
 Id. at 185-86.
 
 
 21
 Judge Owen concluded that "this action was instituted by the Holy Spirit Association for the Unification of the World Christianity for the purpose of harassing Kelly and not because Colombrito genuinely believed that his parents and Kelly had conspired with the intent to deprive him of his civil rights." Id. at 186 (footnote omitted). He therefore termed the suit "vexatious" and "meritless." In a footnote, the judge indicated that, although he had awarded fees under Sec. 1988, he believed that "attorney's fees could also be assessed pursuant to Rule 41 or the common law rule on bad faith litigation." Id. n. 9. Plaintiff and the Church now appeal.
 
 DISCUSSION
 
 22
 In an action under Sec. 1983 an award of attorneys' fees to a prevailing defendant is permissible under Sec. 1988 only if the court finds that the plaintiff's claim "was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 422, 98 S.Ct. 694, 701, 54 L.Ed.2d 648 (1978) (Title VII); accord Hughes v. Rowe, 449 U.S. 5, 14, 101 S.Ct. 173, 178, 66 L.Ed.2d 163 (1980) (Sec. 1988) ("The plaintiff's action must be meritless in the sense that it is groundless or without foundation."). Bad faith on the part of the plaintiff is not a prerequisite for a fee award to defendants, Christiansburg Garment Co. v. EEOC, 434 U.S. at 421, 98 S.Ct. at 700 (Title VII); Davidson v. Keenan, 740 F.2d 129, 133 (2d Cir.1984) (Sec. 1988); General Camera Corp. v. Urban Development Corp., 734 F.2d 468 (2d Cir.1984) (per curiam) (Sec. 1988), although the Christiansburg Court noted that such bad faith would provide "an even stronger basis for charging [plaintiff] with the attorney's fees incurred by the defense." 434 U.S. at 422, 98 S.Ct. at 701 (footnote omitted).
 
 
 23
 Applying this standard, Judge Owen awarded fees under Sec. 1988 to Kelly and his co-defendants based on findings that the plaintiff's suit was "vexatious, meritless," and "for the purpose of harassing Kelly." These findings, if not clearly erroneous, would be sufficient to sustain an award of fees to a prevailing defendant. Before examining the accuracy of Judge Owen's assessment of the merit and motive of Colombrito's suit, however, we turn to defendants' claim that under the terms of the stipulation signed by the Unification Church, the Church has committed itself not to contest any award of fees made in this case.
 
 
 24
 The stipulation signed by the Church, which was drafted by this Court and which accompanied our May 28, 1982 order, simply obligated the Church to pay "any ... fees awarded to the defendants under the Order" (emphasis added), thus contemplating by use of the word "any" the possibility that no fee award might be made. It did not require the Church to waive its right to contest the appropriateness of a fee award. This interpretation is confirmed by the colloquy during argument before us in 1982 of the mandamus petition to require the voluntary dismissal of Colombrito's suit. Although the possibility that the defendants might seek attorney's fees from the Church was posed, its counsel, Laurence H. Tribe, Esq., argued that the issue was premature,[3] and he was not asked by us whether the Church would agree to pay the defendants' attorney's fees. On the contrary, we obtained from him only a commitment that the Church would stipulate not to bring further actions against the defendants arising out of the Colombrito deprogramming effort, since, as defense counsel emphasized, the voluntary dismissal would otherwise leave the defendants, after "having incurred th[e] expense" of the suit, vulnerable to a new suit brought by "another nominal strawman, a judgment-proof nomina[l p]laintiff."
 
 
 25
 The stipulation was thus designed to bind the Church not to bring further actions arising out of the Colombrito episode against Kelly and his colleagues. Otherwise the Church, though officially not a party to the suit, would have been free to finance such further actions. Similarly, the stipulation provided assurance that the defendants, who had no hope of collecting a fee award from Colombrito because he was judgment-proof, could collect from the Church such award, if any, as might be made against Colombrito. However, although the order was intended to require the Church to assume whatever Colombrito's obligations might be, it was not designed to create new ones.
 
 
 26
 If we had intended to resolve the issue of whether a fee award was appropriate, we would have so provided in the order. Rather, the order stated simply that the dismissal was to be "without prejudice to any application which may thereafter be made under 42 U.S.C. Sec. 1988 or other applicable statutes or rules of procedure as if judgment had been rendered in defendants' favor after completion of trial." Nothing in this clause or elsewhere in the order remotely suggests that we considered the case to be "frivolous," "meritless," or "groundless," which would be needed to justify a fee award under Sec. 1988. Our indication that a fee application should be judged as though defendants had prevailed on the merits at trial simply ensured that defendants would be considered the prevailing party. Had the order not included such a statement, defendants might have been barred from seeking fees under Sec. 1988, given our earlier statement that "generally the defendant is not considered the prevailing party when ... there is a voluntary dismissal of the action by the plaintiff with prejudice." Nemeroff v. Abelson, 620 F.2d 339, 350 (2d Cir.1980) (per curiam). The clause in the order here, like a similar stipulation in Nemeroff, simply preserved the defendants' right to move for fees, not to assure that they would be awarded.[4]
 
 
 27
 We therefore turn to the question of whether Judge Owen erred in finding Colombrito's claims to be meritless, vexatious and asserted for the purpose of harassing Kelly. Viewing 42 U.S.C. Sec. 1985(3) as it had been interpreted at the time when Colombrito instituted the present suit, we find that the Supreme Court made clear in Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971), that an action will lie under Sec. 1985(3) when a plaintiff is injured by a private conspiracy to interfere with his constitutional rights, so long as there is "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." Id. (footnote omitted). Several courts have since held that religiously-motivated animus is actionable under the section. See, e.g., Ward v. Connor, 657 F.2d 45, 48 (4th Cir.1981), cert. denied, 455 U.S. 907, 102 S.Ct. 1253, 71 L.Ed.2d 445 (1982); Weiss v. Willow Tree Civic Association, 467 F.Supp. 803, 812 & n. 25 (S.D.N.Y.1979). In addition, the legitimacy of the Unification Church as a bona fide religion has been accepted by several courts for various purposes. See Ward v. Connor, supra, 657 F.2d at 48; Unification Church v. INS, 547 F.Supp. 623, 628 (D.D.C.1982); Holy Spirit Association v. Tax Commission, 55 N.Y.2d 512, 528, 450 N.Y.S.2d 292, 298, 435 N.E.2d 662 (1982). Indeed, courts have upheld pleadings as stating a cause of action under Sec. 1985(3) against deprogrammers by Unification Church members, see Ward v. Connor, supra, 657 F.2d at 46-49; Cooper v. Molko, 512 F.Supp. 563, 568-71 (N.D.Cal.1981), and by members of other unusual religious groups, see, e.g., Taylor v. Gilmartin, 686 F.2d 1346, 1357-61 (10th Cir.1982) (monastery of the Holy Protection of the Blessed Virgin Mary), cert. denied, 459 U.S. 1147, 103 S.Ct. 788, 74 L.Ed.2d 994 (1983); Eilers v. Coy, 582 F.Supp. 1093, 1099-1100 (D.Minn.1984) (Disciples of the Lord Jesus Christ); Mandelkorn v. Patrick, 359 F.Supp. 692, 697-98 (D.D.C.1973) (Children of God).
 
 
 28
 In this light, Colombrito's Sec. 1985(3) action cannot be judged groundless. Indeed, he stood a reasonable chance of inducing a court to find that Kelly's actions were based on an anti-religious animus directed at the Unification Church. Colombrito's mother had obtained a New Jersey state court guardianship order without complying with clear statutory prerequisites for such an order. Kelly and his cohorts, working in cooperation with Colombrito's father, had forcibly abducted the 27-year-old Colombrito. They held him against his will and made efforts to "deprogram" him, i.e., to induce him to abandon his religious beliefs,[5] after displaying the New Jersey state order, which was represented to Colombrito as entitling Kelly to keep in custody for up to 30 days. As one court said of such "deprogrammers" using such tactics,
 
 
 29
 "[C]ertainly their conduct is odious and has the effect of depriving the victim of important rights--his liberty, his freedom, his right to practice his religion, among other rights." Taylor v. Gilmartin, supra, 686 F.2d at 1357.
 
 
 30
 The campaign to "deprogram" Colombrito was inspired by his parents' concern that he was being unduly influenced and adversely affected by his affiliation with the Unification Church. The word "de -program" assumes the existence of a "program," in this case the Unification Church's religious beliefs and practices. If Colombrito could have been persuaded to abandon them he would leave the Church and there would be nothing left to "deprogram."
 
 
 31
 The district court, however, concluded that, since Colombrito acknowledged in his testimony that his parents believed they were acting in his best interests in hiring Kelly to deprogram him and that Kelly was carrying out their wishes, the anti-religious animus or discriminatory intent required by Sec. 1985(3) could not be established. But parental concern and a class-based animus may co-exist or indeed sometimes merge. It could reasonably be inferred from the present record that although the parents acted out of concern for their son's well-being they simultaneously were motivated by an intense animosity toward the Unification Church, to which he had been converted, and toward its beliefs and practices. In their view it was the Church's teachings and practices that had been their son's undoing. Whether or not their appraisal of the Church's beliefs was sincere and shared by others, this gave them no right to seek out and combine with Kelly forcibly to deprive their 27-year-old adult son (not shown in any way to be mentally incompetent) of the right freely to move about, to adopt his own life-style, and to practice the religion he chose, however abhorrent it might be to them. His right to do so is the very core of the First and Fourteenth Amendments. See Ward v. Connor, supra, 657 F.2d at 49; Cooper v. Molko, supra, 512 F.Supp. at 569-70; Comment, The Deprogramming of Religious Sect Members: A Private Right of Action Under Section 1985(3), 74 N.W.U.L.Rev. 229, 241 (1979). But see Weiss v. Patrick, 453 F.Supp. 717, 724 (D.R.I.), aff'd mem., 588 F.2d 818 (1st Cir.1978), cert. denied, 442 U.S. 929, 99 S.Ct. 2858, 61 L.Ed.2d 296 (1979). Even if we assumed arguendo that the Church's alleged "brainwashing" methods used to convert Colombrito were unlawful (e.g., constant proselytizing, fraud, chanting, preaching, self-denial, fund-raising, placement in an isolated or imprisoning abode), this would not justify or provide a defense to use of unlawful measures to "counterconvert" him by abduction, unlawful restraint, physical assault, and enforced behavior modification.
 
 
 32
 Nor was the evidence with respect to Kelly's participation in the kidnapping and attempted "deprogramming" of Colombrito inconsistent with a finding that Kelly conspired with the parents and others out of a religious-based animus. His concession that perhaps 50% of his deprogramming cases were directed toward persons converted by the Unification Church, combined with his colorful description of the need to disabuse such persons of its beliefs and practices, provided the basis for a reasonable inference, despite Kelly's denial of hostility toward the Church, that he acted for the purpose of trying to prevent people from choosing that religion for themselves. Against this background it was clearly erroneous to label Colombrito's Sec. 1985(3) claim groundless, frivolous or meritless within the meaning of Christiansburg and Hughes, supra.
 
 
 33
 Judge Owen's characterization of Colombrito's Sec. 1983 claim, which he grounded on his conclusion that the plaintiff "must have known" that there was insufficient state action, stands on no better footing. After amendment of the complaint pursuant to Fed.R.Civ.P. 15(b) the claim of state action was founded upon the defendants' having consciously obtained an invalid New Jersey court order which was then used to seize Colombrito. The mere existence of a state guardianship order, though erroneously issued, will not transform a defendant's conduct into state action, see Taylor v. Gilmartin, 686 F.2d at 1355. However, "[p]rivate parties who corruptly conspire with a judge ... are ... acting under color of state law within the meaning of Sec. 1983," regardless of the judge's own immunity to suit. Dennis v. Sparks, 449 U.S. 24, 29, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980). See also 1 C. Antieau, Federal Civil Rights Acts Sec. 60, at 111 (2d ed. 1980) ("Private persons acting in a conspiracy with public servants to deprive others of their federal rights are acting under 'color of law' and subject to Sec. 1983 actions."). A defendant's actions are under color of state law if he "reache[s] an understanding" with a judge to violate an individual's rights. Rankin v. Howard, 633 F.2d 844, 850 (9th Cir.1980) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970)), cert. denied, 451 U.S. 939, 101 S.Ct. 2020, 68 L.Ed.2d 326 (1981). Thus courts have refused to dismiss claims alleging state action based on a party's having "induced a judge to abandon his impartiality." Rankin v. Howard, supra, 633 F.2d at 850; accord Brucar v. Rubin, 638 F.2d 987, 993-94 (7th Cir.1980).[6]
 
 
 34
 Given Kelly's letter to Mrs. Colombrito naming a New Jersey judge who had been "very cooperative in signing [such] orders" and the issuance (albeit by a different judge) of the guardianship order despite the Colombritos' failure to meet fundamental statutory prerequisites for such an order, there was at least a colorable basis for an inference of collusion. The application indicated that Anthony resided in Atlanta, Georgia, a location outside the jurisdiction of the New Jersey court, thus indicating to the judge that the requested order, if issued, would be used in a jurisdiction beyond the reach of New Jersey law. (Indeed, it was so used, but in New York rather than in Georgia). Moreover, Mrs. Colombrito submitted only one of the two required physician's certificates to document Anthony's incapacity. In addition, the guardianship order was issued during ex parte proceedings attended only by the judge (and at one point his law clerk) and the attorney for Mrs. Colombrito. Given these circumstances, the initiation of the action under a conspiracy theory was not frivolous or violative of Fed.R.Civ.P. 11.
 
 
 35
 At most Colombrito can be faulted only for persisting in the Sec. 1983 claim after discovery failed to turn up any additional evidence of a conspiracy between defendants and/or the Colombritos and the New Jersey judge. However, the Sec. 1983 claim was dismissed by Judge Owen at the close of plaintiff's direct case on the fourth day of trial and the evidence thus far adduced by plaintiff on the Sec. 1983 claim was relevant also to the private conspiracy charge under Sec. 1985(3). Hence, the plaintiff's failure to drop the Sec. 1983 claim at that point added no additional testimony or expense to the trial. Since the claims were closely intertwined and since the continuation of the Sec. 1983 claim past discovery had only scant effect on the time and other resource costs of the litigation, the defendants would not be entitled to an award of fees even if the continuation of the Sec. 1983 claim past discovery were frivolous. Cf. Hensley v. Eckerhart, 461 U.S. 424, 434-37, 103 S.Ct. 1933, 1940-41, 76 L.Ed.2d 40 (1983).
 
 
 36
 On the whole, then, Colombrito's suit cannot be considered groundless, frivolous or meritless. This conclusion finds further support in statements by Judge Owen and by the defense attorneys in the course of the fee application. Judge Owen, in assessing the amount of the fee award, recognized "the complexity of the issues" in the case, 590 F.Supp. at 186, and in their application for fees the defendants themselves characterized the case as involving "new and changing principles of constitutional law." Under the standards of Christiansburg and Hughes, the fee award to defendants under Sec. 1988 must be reversed.Alternative Authority Claimed for the Award of Fees
 
 
 37
 Defendants argue that, even if an award of legal fees to them under Sec. 1988 is held to be impermissible, the district court had the inherent power to make such an award with respect to Colombrito's claim. We disagree.
 
 
 38
 We start with the premise that under the American Rule, absent statutory authorization or an established contrary exception, each party bears its own attorney's fees. See Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975). The only pertinent exception for present purposes is the court's inherent authority to award fees when a party litigates frivolously or in bad faith. See id. at 258-59, 95 S.Ct. at 1622-23; Gerena-Valentin v. Koch, 739 F.2d 755, 761 (2d Cir.1984); PRC Harris, Inc. v. Boeing Co., 700 F.2d 894, 898 (2d Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983). The bad faith exception permits an award upon a showing that the claim is "entirely without color and has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons." Browning Debenture Holders' Committee v. DASA Corp., 560 F.2d 1078, 1088 (2d Cir.1977). Neither meritlessness alone, see Gerena-Valentin v. Koch, supra, 739 F.2d at 761; PRC Harris, Inc. v. Boeing Co., supra, 700 F.2d at 898, nor improper motives alone, see Nemeroff v. Abelson, 620 F.2d 339, 348 (2d Cir.1980), will suffice.
 
 
 39
 No doubt the Unification Church and many of its members are hostile to Kelly and would like to see him cease his operations. Nonetheless, even if the Church believes or hopes that obtaining appropriate legal redress against deprogrammers will deter them from such acts in the future, it is not inappropriate for the Church to fund and pursue litigation that advances meritorious civil rights claims, see N.A.A.C.P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), so long as the Church does not abuse judicial process in the course of prosecuting its claims, see Hall v. Cole, 412 U.S. 1, 15, 93 S.Ct. 1943, 1951, 36 L.Ed.2d 702 (1973); Lipsig v. National Student Marketing Corp., 663 F.2d 178, 180 (D.C.Cir.1980). Hostility between parties or their counsel ought not to invalidate a lawsuit brought to obtain proper legal relief for potentially meritorious claims. See Massachusetts Union of Public Housing Tenants v. Pierce, 577 F.Supp. 1499, 1503 (D.D.C.1984), rev'd on other grounds, 755 F.2d 177 (1985). Given our holding above that Colombrito's case against Kelly was at least colorable, we conclude that the district court's award of fees under its inherent authority cannot be sustained.
 
 
 40
 Defendants also rely on Judge Owen's suggestion that a fee award would have been justified under Rule 41(a)(2), which provides that
 
 
 41
 "an action shall not be dismissed at the plaintiff's instance [after the service of pleadings by an opposing party] save upon order of the court and upon such terms and conditions as the court deems proper.... Unless otherwise specified in the order, a dismissal under this paragraph is without prejudice."
 
 
 42
 We note, first, that defendants' application for fees did not invoke Rule 41 at all. Nonetheless, because the court cited the rule as alternative authority for its award of fees, we consider its applicability here.
 
 
 43
 Fee awards are often made when a plaintiff dismisses a suit without prejudice under Rule 41(a)(2). See 5 J. Moore, Moore's Federal Practice, p 41.06, at 41-74 (2d ed. 1948 & Supp.1984); 9 C. Wright & A. Miller, Federal Practice & Procedure Sec. 2366, at 177-80 (1971 & Supp.1984). The purpose of such awards is generally to reimburse the defendant for the litigation costs incurred, in view of the risk (often the certainty) faced by the defendant that the same suit will be refiled and will impose duplicative expenses upon him. See Smoot v. Fox, 353 F.2d 830, 833 (6th Cir.1965), cert. denied, 384 U.S. 909, 86 S.Ct. 1342, 16 L.Ed.2d 361 (1966); John Evans Sons, Inc. v. Majik-Ironers, Inc., 95 F.R.D. 186, 191 (E.D.Pa.1982).
 
 
 44
 In contrast, when a lawsuit is voluntarily dismissed with prejudice under Fed.R.Civ.P. 41(a)(2), attorney's fees have almost never been awarded. Several courts have held that a Rule 41(a)(2) award of fees in such a situation is appropriate only when there is independent statutory authority for such an award. See Smoot v. Fox, supra, 353 F.2d at 832-33; Lawrence v. Fuld, 32 F.R.D. 329, 331-32 (D.Md.1963). This Circuit has previously assumed as much. See Larchmont Engineering, Inc. v. Toggenberg Ski Center, Inc., 444 F.2d 490, 491 (2d Cir.1971) (assuming that a fee award was only proper under the terms of the applicable patent law); accord Sarkes Tarzian, Inc. v. Philco Corp., 351 F.2d 557, 559-61 (7th Cir.1965); Wainwright Securities Inc. v. Wall Street Transcript Corp., 80 F.R.D. 103, 108 (S.D.N.Y.1978); Pacific Vegetable Oil Corp. v. S/S Shalom, 257 F.Supp. 944, 948 (S.D.N.Y.1966) ("[I]t is clear that in the context of a dismissal with prejudice attorney's fees and expenses are not appropriate."). Some courts have assumed or held that fees can be awarded under exceptional circumstances but have failed to find such circumstances on the facts before them. See Mobile Power Enterprises, Inc. v. Power Vac, Inc., 496 F.2d 1311, 1312 (10th Cir.1974); John Evans Sons, Inc. v. Majik-Ironers, Inc., supra, 95 F.R.D. at 191. Still others have declined to award fees without precisely defining the governing rule. See, e.g., Arthur v. Starrett City Associates, 98 F.R.D. 500, 504-05 (E.D.N.Y.1983); M.A. Gammino Construction Co. v. Great American Insurance Co., 52 F.R.D. 323, 326-27 (D.R.I.1971).
 
 
 45
 The reason for denying a fee award upon dismissal of claims with prejudice is simply that the defendant, unlike a defendant against whom a claim has been dismissed without prejudice, has been freed of the risk of relitigation of the issues just as if the case had been adjudicated in his favor after a trial, in which event (absent statutory authorization) the American Rule would preclude such an award. Here, there is no question that the dismissal is with prejudice as to the Church and as to Colombrito, leaving Kelly and his company wholly free of the risk of Church-supported suits stemming from adjudication of the merits. We would not want to discourage such a salutory disposition of litigation by threatening to award attorneys' fees if a plaintiff did not complete a trial. See 444 F.2d at 491; Arthur v. Starrett City Associates, supra, 98 F.R.D. at 505.
 
 
 46
 We have found only one case that awarded fees under Rule 41(a)(2), following a dismissal with prejudice, without relying on some statutory authority. See Krasnow v. Sacks & Perry, Inc., 58 F.Supp. 828 (S.D.N.Y.1945). Any persuasive force of Krasnow is diminished, however, not only by the extensive contrary decisional law within the Circuit but also by the fact that since it was a patent law case, an attorney's fee may well have been authorized by 35 U.S.C. Sec. 285 (authorizing fees in "exceptional cases"). Indeed at least one court has so interpreted it. See Lawrence v. Fuld, 32 F.R.D. at 331-32. The only other case we have uncovered awarding fees under Rule 41(a)(2) as a condition of a dismissal with prejudice relied on both the presence of exceptional circumstances and on a statutory fee authority in the patent law. See Gilbreth International Corp. v. Lionel Leisure, Inc., 587 F.Supp. 605, 614-15 (E.D.Pa.1983). In view of the questionable origins and rationale of the "exceptional circumstances" test,[7] we decline to adopt it as the standard for a fee award under Rule 41(a)(2).
 
 
 47
 Our reading of Rule 41(a)(2) does not altogether foreclose fees in the event of a dismissal with prejudice. Conceivably such an award might be one of the appropriate "terms or conditions" authorized by Rule 41(a)(2), e.g., if a litigant had made a practice of repeatedly bringing potentially meritorious claims and then dismissing them with prejudice after inflicting substantial litigation costs on the opposing party and the judicial system. In any event, this is not such a case.[8]
 
 
 48
 Having found a fee award improper under Sec. 1988 and unsustainable under either common law authority or under Rule 41(a)(2), we reverse the judgment of the district court awarding fees. We have considered the appellants' remaining claims and find them to be without merit. We therefore remand the case to the district court with directions to enter judgment in accordance with this opinion.
 
 
 
 *
 Of the United States District Court for the Eastern District of New York, sitting by designation
 
 
 [1]
 "Deprogramming" has been described as follows:
 "Deprogrammers are people who, at the request of a parent or other close relative, will have a member of a religious sect seized, then hold him against his will and subject him to mental, emotional, and even physical pressures until he renounces his religious beliefs. Deprogrammers usually work for a fee, which may easily run as high as $25,000.
 "The deprogramming process begins with abduction. Often strong men muscle the subject into a car and take him to a place where he is cut off from everyone but his captors. He may be held against his will for upwards of three weeks. Frequently, however, the initial deprogramming only lasts a few days. The subject's sleep is limited, and he is told that he will not be released until his beliefs meet his captors' approval. Members of the deprogramming group, as well as members of the family, come into the room where the victim is being held and barrage him with questions and denunciations until he recanted his newly found religious beliefs." LeMoult, Deprogramming Members of Religious Sects, 46 Fordham L.Rev. 599, 604-05 (1978) (footnotes omitted).
 
 
 [2]
 Section 1985(3) prohibits conspiracies to deprive individuals of their civil rights:
 "If two or more persons in any State ... conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."
 
 
 [3]
 One member of the 1982 panel asked Laurence H. Tribe, Esq., representing the Church, whether "it would be open to the Defendants or Defendant upon the Court's dismissal with prejudice to seek attorneys fees on the basis that the suit was frivolously brought." Tribe replied:
 "I suppose they could try, but [the] circumstances of this case in which the suit was vigorously pressed until the spiritual leader of the church seemed endangered would at least present an obvious response, but those issues are surely premature."
 
 
 [4]
 Likewise, the statement in our 1982 order precluding proceedings that would "circumvent[ ] or frustrat[e] the purpose of th[e] writ" indicates only the panel's concern that the district judge might seek to prolong the inquiry into the validity of the Unification Church as a religion and its desire to preclude him from using a hearing on the fee application as a vehicle for any such effort
 
 
 [5]
 For present purposes the issue is not whether we believe the Unification Church to be a bona fide religion but whether the lawsuit brought by Colombrito was frivolous. In view of the holdings of other courts that the tenets and practices of the Church constituted a bona fide religion, his institution of a lawsuit to enjoin Kelly from preventing him from practicing those beliefs clearly was not frivolous
 
 
 [6]
 Although the plaintiffs now urge this Court to rely on Lugar v. Edmondson Oil Co., 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), as a basis for finding state action, they did not challenge below the constitutionality of the New Jersey guardianship statute, which, inter alia, would be necessary for Lugar to apply to their suit. 457 U.S. at 942, 102 S.Ct. at 2756
 
 
 [7]
 The exceptional circumstances test probably reflects the references in early cases to the statutory test for fees under patent law, see, e.g., Lawrence v. Fuld, 32 F.R.D. at 331-32, and possibly the reference in Smoot v. Fox, supra, to the court's inherent authority to award fees in exceptional cases in equity, 353 F.2d at 832. This language seems to have been picked up in later cases and stated as a more general rule, without particular explanation of its relevance
 
 
 [8]
 Although Judge Owen made findings about the existence of another case brought by a Unification Church member (Vogel) against Kelly that was dropped and about an organized movement by cultists to drive Kelly out of the deprogramming business, these findings do not suffice to demonstrate that this action was brought only to harass Kelly rather than to pursue to judgment non-frivolous claims against him. It was not until the Reverend Moon was subpoenaed to testify and we refused to quash that subpoena that the plaintiff sought to dismiss this case to avoid causing embarassment to an individual he viewed as his Messiah
 The prior discontinuation of one other suit against Kelly by a Church member does not reveal a pattern of Church-controlled suits brought without the intention of pursuing the claims to judgment. The prior case was initiated after the present litigation began, and there is a suggestion that it was dropped at an earlier point when that plaintiff and her parents reconciled. Similarly, the evidence of a conspiracy among cultists to discredit Kelly and to encourage and assist litigation against him does not prove that the plaintiff intended from the start to abandon the instant suit midstream.